**NEWPORT NEWS INDUSTRIAL,**
**et al., Plaintiffs,**

**v.**

**DYNAMIC TESTING, INC.,**
**et al., Defendants.**

**CIV. A. No. 3:00CV379.**

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 5, 2001.

Joseph C. Kearfott, Michael R. Shelbelski, Hunton & Williams, Richmond, VA, Douglas W. Kenyon, Hunton & Williams, Raleigh, NC, for Plaintiffs.

Christopher Schwartz, Leslie McAdoo–Brobson, Steven D. Gordon, Holland & Knight, LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

The Motion for Partial Judgment on the Pleadings filed by the Defendants is ripe for decision on the issue whether the Virginia Uniform Trade Secrets Act ("VUTSA"), Va.Code § 59.1–336 *et seq.* precludes respondeat superior liability. For the reasons set forth below, it does not.

## STATEMENT OF FACTS

Plaintiff Newport News Shipbuilding, Inc. ("NNSI") instituted this action in the name of its operating division, Newport News Industrial ("NNI"). Plaintiff Newport News Shipbuilding and Dry Dock Company ("NNS") is a wholly owned subsidiary of NNSI.

NNS is one of the nation's premier shipbuilders and also provides products to the United States Navy. NNI engages in numerous industrial activities, including the manufacture of components and products engineered by NNS. NNI has no engineering staff of its own, instead relying exclusively on NNS and other firms for engineering support. Defendant Samuel Runge was employed by NNS as an engineer from May 1982 to January 15, 1999.

In late 1991, NNS began exploring possible designs for shock mounts for the Navy to use to protect "commercial-off-the-shelf" ("COTS") equipment from the effects of jarring and movement that are necessarily attendant to military use. As part of this design effort, Runge participated in the development of a Shock Acoustic Mount ("SAM"), which was the first known application of HytrelTM (a thermoplastic polyester elastomer substance) in Naval shock mounts.

In 1996, NNS began developing a shock mount as part of the Integrated Communications and Advanced Network Program (ICAN) Navy Contract. The Navy again sought shock mount designs that would enable it to more easily use COTS equipment. The development of the mount for the ICAN program was funded by the Navy pursuant to its Aircraft Carrier Engineering Support ("ACES") contract with NNS.

NNI and NNS allege that Runge relied upon a unique C-shaped mount that he had conceived and, to some extent, developed, while using NNS Internal Research and Development (IR & D) funds. It is undisputed that Runge played a central role in developing the C-shaped mount using Hy-

trelTM. He was involved also in programs for the testing of alternative materials which might be used to manufacture the shock mounts.

On March 12, 1997, NNS reported the invention of the C–Worthy mount to the Navy and notified the Navy of its intention to retain title to the invention and to file for a patent on it, pursuant to the Patent Rights Provision of the ACES contract. NNS filed that patent application on July 3, 1997, stating in the applications that the mount could be scaled up or down for larger and smaller loads by varying the dimensions of the mount or by using a material with greater or lesser elasticity.

In mid–1997, Runge began developing a "scaled-up" version of the C-shaped mount in order to support heavier loads. The smaller version became known as the Style–2 C–Worthy Mount and the larger version became known as the Style–1 C–Worthy Mount.[1] In March 1998, Runge created a document called the "Business Plan for Advanced Design Shock Mounts" ("Business Plan"), wherein he discussed market projections, customer lists, cost figures, and advertising strategies. The document explicitly stated that the implementation of the business plan might be at NNS or at NNI or at some other subsidiary of the parent.

Runge also authored an initial marketing brochure for the Style 1 C–Worthy mount (published on April 6, 1998) and a second brochure for the Style 2 C–Worthy mount (published on July 1, 1998). These brochures were distributed to potential customers. NNS copyrighted these brochures on June 19, 2000 and June 9, 2000, respectively. NNI and NNS recently executed (August 15, 2000) an assignment of copyrights, in which NNS assigned to the Parent an undivided one-half interest in the copyrights, though the Plaintiffs contend that NNI was a beneficial owner of the copyrights from the time it succeeded to NNS's shock mount business.

In addition to distributing brochures, NNI and NNS also sent prototypes of the mounts to potential customers, as well as drawings of, and engineering data about, the mounts. The parties dispute whether this information was distributed with any expectation of confidentiality or with any indication that it was confidential information.

Defendant Dynamic Testing, Inc. ("DTI") performs testing services for equipment to be used in military and commercial maritime applications. NNS routinely contracted with DTI to perform testing services for its new designs. In 1998, NNS engaged DTI to undertake testing on the new C–Worthy mount. As part of the purchase orders between the two companies, DTI agreed not to use or disclose the information that it received in connection with the testing it was to perform.

In May 1998, NNS made the decision to use NNI for the development of the shock mount. NNS transferred the C–Worthy business to NNI so that NNI could undertake manufacture of the product.[2] During the transition, Runge provided significant support to NNI respecting production methods, alternative composition materials, sales and marketing.

DTI extended an offer of employment to Runge on October 9, 1998 and Runge accepted that offer on October 25, 1998. Although Runge informed NNS that he

---

**1.** NNS also filed for an international patent in July 1998 for both the Style 1 and Style 2 mounts, wherein it reiterated that the design could be modified depending on the weight of the load.

**2.** In their Second Amended Complaint ("SAC"), the Plaintiffs contend that the "product development lifecycle" of a new product designed by NNS and produced by NNI involved the transition of the product's "technology, and all associated rights and protections associated therewith from NNS to NNI as successor in interest. Typically, the transition of such technology from NNS and NNI has not been formalized, but has come to be generally known and understood by Parent, NNS, NNI and their agents."

would be leaving for employment at DTI, he did not disclose to NNS that his work there would involve the development of a competing shock mount. Runge left employment at NNS on Friday, January 15, 1999 and began his employment at DTI on Monday, January 18, 1999.

On January 19, a company by the name of DTI Engineering, LLC ("DTIE") issued a purchase order to DTI authorizing it to provide research and development engineering for the creation of a shock mount. DTIE was created for the sole purpose of funding the development of a component isolation shock mount and other marine products. However, DTIE has no employees of its own. Instead, it contracts with DTI to provide all the design, development, testing, engineering, manufacture and marketing of the mounts. The exact date on which DTIE came into existence is unknown. However, the company was not actually incorporated until July 29, 1999.

On May 5, 1982, when he first began his employment with NNS, Runge executed an Employee Agreement with NNS wherein he agreed: (1) not to disclose the company's confidential information; (2) to disclose to NNI all of his inventions; and (3) that all inventions created a year after his employment relating to the subject of his employment would presumptively belong to NNS. NNI and NNS allege that Runge violated this agreement by creating alternate shock mount designs and not disclosing these designs to NNS and by revealing trade secret and confidential information to the Defendants.

According to the Plaintiffs, Runge created a shock mount design for DTI and DTIE which mirrors the C–Worthy mount that he created while employed at NNS. DTI advertises its mounts, the DTI–Shock Mount, through brochures that are essentially the same as NNS's, (according to the

Plaintiffs), and therefore infringe their copyrights. The Plaintiffs assert that Runge took with him electronic files containing NNS's brochures and used those files to create the DTI brochure.

In August 2000, DTI entered an agreement with DTI Holdings, LLC ("DTIH") in which DTI transferred all of its assets and most of its liabilities to DTIH, effective as of January 1, 2000. DTIH has the same employees and essentially the same management as DTI. The Plaintiffs allege that DTIH is liable for its own acts and omissions occurring after January 1, 2000, and is liable as a successor in interest for the acts of DTI prior to January 1, 2000.

During discovery related to this litigation, the Plaintiffs discovered, on the computer used by Runge while employed by NNS, a computer file which Runge had created. It detailed the design of a C-shaped mount which is quite similar in appearance to the DTI–Shock mount. Apparently, Runge intended to delete from that computer all his files before he left NNS, but this one was somehow overlooked. In his deposition, Runge admitted that he had created this design while employed by NNS. However, he claims that he deleted the design because it had flaws and proved to be unworkable.

The Plaintiffs now seek to hold Runge, DTI, DTIH, DTIE and the officers of those corporations Michael Dolan and Randolph Fairfield [3] liable for Copyright Infringement, Misappropriation of Trade Secrets, Breach of Contract, Breach of Fiduciary Duty, Tortious Interference with Contract, Conspiracy to Injure NNS in its Trade or Business, Conversion and Unjust Enrichment.

## DISCUSSION

The Motion for Partial Judgment on the Pleadings is addressed only to the claim,

---

3. Michael Dolan is president and a director of DTI, managing director and member of DTIE, and president, chief executive officer and member of DTIH. NNS and NNI seek to hold Dolan liable for the acts of DTIE prior to its incorporation on July 29, 1999. Defendant Randolph Fairfield is executive vice-president and general manager of DTI and of DTIH, a director of DTI, and a member of DTIH.

under Va.Code § 59.1–336 ("VUTSA"), for Misappropriation of Trade Secrets. DTI and DTIE argue that they cannot be vicariously liable for any alleged misappropriation committed by Runge because the VUTSA does not allow for the imposition of liability under the theory of respondeat superior.

As a procedural matter, the DTI and DTIE bring this motion pursuant to Fed. R.Civ.P. 12(c) rather than Rule 12(b)(6) because the pleadings are closed, yet they have already filed a responsive pleading. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999) (defendant's motion for failure to state a claim should be analyzed pursuant to Rule 12(c) as a motion for judgment on the pleadings because the defendant previously filed an answer). Rule 12(h)(2) allows a party to present the defense of failure to state a claim upon which relief can be granted in a motion for judgment on the pleadings. Rule 12(c) then allows the court to hear a motion for judgment on the pleadings after the pleadings are closed, but within such time as to not delay trial.

The difference between the Rule 12(c) analysis and that of Rule 12(b)(6), however, "does not have a practical effect upon [the court's] review because ... [the court] appl[ies] the standard for a Rule 12(b)(6) motion." *Id.* When considering a motion under Rule 12(b)(6), "the allegations of the complaint are to be liberally construed and the motion should be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief.' " *Westmoreland v. Brown,* 883 F.Supp. 67, 70 (E.D.Va.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). All factual allegations in the complaint are presumed to be true and all reasonable inferences are granted to the non-moving party. *Id.* "However, the court is not bound to accept as true 'conclusory allegations regarding the legal effect of the facts alleged.' " *Id.* (citing *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995)). If the court determines that the plaintiff can prove no set of facts which would entitle it to relief, or that as a matter of law, the complaint lacks a cognizable legal theory, then dismissal is proper. *See Conley,* 355 U.S. at 45–46, 78 S.Ct. 99; *Labram,* 43 F.3d at 920.

## I. Respondeat Superior Liability Generally

Section 219 of the Restatement of Agency (Second) provides that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Relevant to the present dispute, the commentary to § 219 explains that:

> It is true that normally one in control of tangible things is not liable without fault. But in the law of master and servant the use of the fiction that "the act of the servant is the act of the master" has made it seem fair to subject the non-faulty employer to liability for the negligent and other faulty conduct of his servants.... [W]ith the growth of large enterprises, it became increasingly apparent that it would be unjust to permit an employer to gain from the intelligent cooperation of others without being responsible for the mistakes, the errors of judgment and the frailties of those working under his direction and for his benefit.

Restatement (Second) of Agency, § 219 cmt. a. *See also id.* § 216 ("A master or other principal may be liable to another whose interests have been invaded by the tortious conduct of a servant or other agent, although the principal does not personally violate a duty to such other or authorize the conduct of the agent causing the invasion").

Additionally, the Restatement of Agency specifically recognizes that respondeat superior imposes liability on an employee for unfair trade practices committed by an employee. *See* Restatement (Second) of Agency § 248 ("A master is subject to liability to third persons injured in their

business relations by the tortious conduct of a servant acting within the scope of employment. . . .")

■ The doctrine of respondeat superior is thoroughly ensconced in Virginia law: "an employer is liable for the tortious acts of its employee if that employee was performing the employer's business and acting within the scope of the employment when the tortious acts were committed." *Giant of Maryland, Inc. v. Enger*, 257 Va. 513, 516, 515 S.E.2d 111, 112 (1999). *See Kensington Assocs. v. West*, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987) (same).

■ "Generally, an act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, and did not arise wholly from some external, independent, and personal motive on the part of the employee to do the act upon his own account." *Id.* 234 Va. at 432, 362 S.E.2d at 901. (internal citations omitted). And, the employer is liable even for intentional torts committed by the employee so long as they are committed in the scope of employment. *See Commercial Bus. Sys., Inc. v. Bell-South Serv., Inc.*, 249 Va. 39, 45, 453 S.E.2d 261, 265 (Va.1995) ("wilfulness or wrongful motive which moves an employee to commit an act which causes injury to a third person does not itself excuse the employer's liability therefor. The test of liability is not the motive of the employee in committing the act complained of, but whether that act was within the scope of the duties of employment and in the execution of the service for which he was engaged").

In this action, the Plaintiffs clearly state a claim for respondeat superior liability, if this theory be available at all, against the Defendant companies. They allege that Runge's disclosure of trade secrets would necessarily be incident to DTI and DTIE's development of a competing shock mount and that Runge disclosed and used the trade secret information for the benefit of DTI and DTIE.

## II. Respondeat Superior and the VUTSA

By invoking the theory of respondeat superior, the Plaintiffs seek to impose liability upon the Defendant companies for Runge's alleged misappropriation even if the Defendants did not know of the misappropriation. The Defendants argue that the VUTSA imposes liability only if the Defendants knew or had reason to know of Runge's misappropriation and that, therefore, the VUTSA foreclose liability under the theory of respondeat superior.

### A. The Plain Language of the Statute

The starting point for the analysis, of course, is the text of the VUTSA. It defines "misappropriation" as:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

  a. Used improper means to acquire knowledge of the trade secret; or

  b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

    (1) Derived from or through a person who had utilized improper means to acquire it;

    (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

    (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(4) Acquired by accident or mistake.

Va.Code § 59.1–336. "Improper means" includes "theft bribery, misrepresentation, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* A "person" for purposes of the statute is a "natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity."

The Defendants urge that the failure of the VUTSA explicitly to provide for respondeat superior liability in defining misappropriation, when considered in perspective of the VUTSA preemption provision (Va.Code § 59.1–341) requires the conclusion that the statute precludes the application of the doctrine of respondeat superior.

The Defendants' theory necessitates an assessment of the preemption provision which only "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." Va.Code § 59.1–341. Respondeat superior is not an independent conflicting tort, civil claim or remedy. Rather, it is a legal precept that presupposes the existence of an underlying claim and assesses liability not because of the act giving rise to the claim but because of a certain status. Thus, one cannot bring a claim of "respondeat superior," instead one simply relies on this theory as a vehicle for imposing on the principal liability for the underlying wrongful acts of the agent. Because it does not "conflict" with the VUTSA in any sense of the word, the preemption provision has no bearing upon the current inquiry.

Moreover, no other section of the statute precludes vicarious liability. While the definition of "misappropriation" requires some type of misconduct or bad faith on the part of the misappropriator, nothing in the statute precludes liability for the employer due to the misconduct or bad faith of his employee conducted for the employer's benefit. Respondeat superior liability simply does not change the nature of the prohibited conduct in the VUTSA. As the Third Circuit explained in the context of Lanham Act, 15 U.S.C. § 1125 *et seq.*:

> [C]ourts imposing liability on agency theories are not expanding the category of affirmative conduct proscribed by the relevant statute; rather, they are deciding on whose shoulders to place responsibility for conduct indisputably proscribed by the relevant statute. The principal is held liable not because it committed some wrongdoing outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its status merits responsibility for the tortious actions of its agent.

*American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1430–31 (3d. Cir.1994). Likewise, within the context of the VUTSA, applying respondeat superior liability would not allow liability without fault in the absolute sense, but rather would allow liability based upon the fault of another—in this case, the fault of Runge in misappropriating and using the trade secret.

## B. Commentary to the Uniform Trade Secrets Act

The Virginia statute derives from the Uniform Trade Secrets Act. *See Avtec Sys. v. Peiffer,* 21 F.3d 568, 574 (4th Cir. 1994) (the VUTSA "closely tracks" the Uniform Act). The Commissioners' Comment to the "Damages" provision of the Uniform Act explains that *sometimes* the innocent user of the misappropriated trade secret may not be liable for damages:

> Monetary relief can be appropriate whether or not injunctive relief is granted under section 2. If a person charged with misappropriation has acquired knowledge of a trade secret in good faith without reason to know of its misappropriation by another, however, the same considerations that can justify denial of all injunctive relief also can justify deni-

al of all monetary relief. See *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150 (C.A.2, 1949) (no relief against new employer of employee subject to contractual obligation not to disclose former employer's trade secrets where new employer innocently had committed $40,000 to develop the trade secrets prior to notice of misappropriation).

(reprinted in Callman, *Unfair Competition Trademarks and Monopolies*, § 20.02 (4ed.1984)).

This 1979 comment was integrated into the current damages provision of the UTSA (revised in 1985), which is substantially the same as the damages provision adopted by the VUTSA. The newer provision embraces the same exception to liability as that outlined in the Comments:

> Except where the user of a misappropriated trade secret has made a material and prejudicial change in his position prior to having either knowledge or reason to know of the misappropriation and the court determines that a monetary recovery would be inequitable, a complaintant is entitled to recover damages for misappropriation.

Va.Code. Ann. § 59.1–338. The injunctive relief provision allows a similar exemption by allowing an injunction against future use to be conditioned upon payment of a reasonable royalty in exceptional circumstances. *Id.* at § 59.1–337. "Exceptional circumstances include ... a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable." *Id.*

Contrary to the Defendants' arguments, the exception for a material and prejudicial change in position before discovery of the misappropriation in both the injunction and damages sections does not preclude respondeat superior liability, but instead provides a *defense* to vicarious liability for innocent employers.[4]

Certainly the relief provisions of the VUTSA evince a desire to spare the truly innocent user in certain circumstances. Beyond this, the statute does not speak to respondeat superior liability, much less displace the common law principle of its application. Instead, the statute requires a "case-by-case" analysis of the equities to determine when relief is appropriate.

## III. Relevant Case Law

■ The Defendants place great reliance upon *Conmar*, the 1949 Second Circuit case mentioned in the Comments to the Uniform Act. 172 F.2d 150. In *Conmar*, the plaintiff alleged that the defendant corporation enticed away several of its employees and used trade secret information that the employees had acquired while working for plaintiff. *Id.* at 154. Judge Learned Hand explained that:

> Courts have been accustomed to speak of trade secrets as "property," and at times to deal with them as if they were. That may be permissible and to some extent desirable, when the question is whether the wrongdoer has got access to them by some wrongful means, like breaking into a factory, or copying formulae or blue prints. When, however, the dispute turns, as it does here, upon whether the wrongdoer has acquired a secret from the employee who has himself acquired it lawfully, the wrong consists in inducing him to break his contract, or to be disloyal to a confidence reposed in him; and in either case it is a species of tor[t]—recognized now for over a century—of inducing an obligor to default upon an obligation.

*Id.* 172 F.2d at 155. The court found that, even if the defendant employer had induced the employees to breach their confi-

---

4. One can imagine that an employer could be liable for the wrongful acts of his employee, but could not qualify for the exception because it has not yet made a "material" or "prejudicial" change of position.

dences, the Restatement of Torts [5] provided an excuse for continued exploitation of a secret when the user has heretofore been innocently exploiting it and has substantially changed his position prior to learning of the secret. *See id.* at 156. "The act of inducing the breach is the wrong, and the inducer's ignorance is an excuse only because one is not ordinarily held liable for consequences which one could not have anticipated." *Id.* However, "each case must stand on its facts; the answer depends upon weighing the loss to the inducer against the benefit to the obligee." *Id.*

As an initial matter, *Conmar* was decided *before* the Uniform Act was created. The Uniform Act changed the nature of what information qualified as a "trade secret." [6] Additionally, both the Uniform Act and the VUTSA proscribe a broader range of activity than those acts listed by example in the *Conmar* opinion (breaking into a factory or copying blue prints), thus broadening the scope of prohibited actions. Secondly, to say that in a misappropriation of trade secrets claim against an competing employer, one "wrong" consists of inducing the employee to breach his duty does not, at the same time, preclude the possibility that the competing employer may be liable for other wrongs as well.

Indeed, *Conmar* did not address vicarious liability at all. Instead, it focused upon whether the employer could be *directly* liable for using trade secret information provided by its new employees. The *Conmar* court believed that the defendant had an "excuse" for exploiting the secret prior to being informed of the disclosure, therefore did not impose liability upon the defendant. Though the facts of *Conmar* are substantially similar to those presented here, the explicit holding in *Conmar* and its subsequent adoption in the Uniform Act is in no way inconsistent with respondeat superior liability.

The parties have discovered only one decision considering whether respondeat superior is a viable theory of liability under the Uniform Act. In an unpublished Minnesota Court of Appeals case, *Hagen v. Burmeister & Assocs., Inc.*, 1999 WL 31130 (Minn.App.1999), the court addressed the very issue raised today. [7] The court observed that misappropriation of a trade secret is an intentional tort and the doctrine of respondeat superior usually applies when a party seeks to hold a corporation liable for a tort committed by its employee. *See id.* at *3. Moreover, the doctrine applies to a broad range of com-

---

**5.** In language reminiscent of the VUTSA damages provision, section 758 of the Restatement of Torts (First) provides:

> One who learns another's trade secret from a third person without notice that it is secret and that the third person's disclosure is a breach of his duty to the other, or who learns the secret through a mistake without notice of the secrecy and the mistake,
> (a) is not liable to the other for a disclosure or use of the secret prior to receipt of such notice, and
> (b) is liable to the other for a disclosure or use of the secret after the receipt of such notice, unless prior thereto he has in good faith paid value for the secret or has so changed his position that to subject him to liability would be inequitable.

Restatement of Torts, § 758 (1939). The Second Restatement omits this section: "trade practices and labor disputes have been omitted, in the view that these subjects have become substantially specialities, in their right, governed extensively by legislation and large-

ly divorced from their initial groundings in the principles of torts." *Id.* Introduction to Vol. 4, pp. VII.

**6.** The Comment to Section 1 explains that "[t]he definition of 'trade secret' contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be 'continuously used in one's business'."

**7.** *Hagen* took the view that respondeat superior is a common law remedy, and although it is not listed in the UTSA, "remedies provided in the MTSA [Minnesota Trade Secrets Act] are not exclusive" because the provision only displaces conflicting remedies. *Id.* at *3. As explained above, the doctrine of respondeat superior is not really a "remedy" in the sense that it affords the predicate for a claim. Rather, it applies to affix liability on the basis of the statute. But, even if the doctrine is a "remedy," it certainly is not in conflict with those in the Uniform Act.

mon law torts and federal statutory wrongs (i.e. the Lanham Act). *See id.* "These same principles that support extension of the respondeat superior doctrine in federal law apply to violations of state statutes." *Id.* at *4. Therefore, logically the theory of vicarious liability would apply to trade secret torts committed by an agent in the course and the scope of the agency. *See id.* Specifically, the court relied upon § 248 of the Restatement of Agency and the commentary thereto:

> A master who authorizes a servant to compete with others and to do such acts as appear to the servant to be reasonably necessary in order to make such competition effective is subject to liability to persons injured by tortious acts committed in the course of such competition if intended for the benefit of the principal or master and if not an extraordinary or outrageous method of conducting such competition.

*Id.* (citing Restatement of Agency (Second) § 248 (1958) cmt. a). On that reasoning, the court remanded for a new trial on this issue, noting that the essential element to be decided at the new trial would be whether the employee committed the tort within the scope of new employment. *See id.*

The Minnesota version of the Uniform Act at issue in *Hagen* is almost identical to the VUTSA, and the differences are not relevant here. Like Minnesota, the doctrine of respondeat superior is well-settled in Virginia and applies to intentional torts. Neither the VUTSA nor the Minnesota Act, in their definitions, preemption provisions or elsewhere, specifically or impliedly reject vicarious liability. Instead, it is perfectly consistent to hold the employer liable for the infringing acts of its employee committed within the employee's scope of employment. The employer reaps the benefit of the employee's misconduct and therefore should be liable for the harm that conduct causes.[8]

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Partial Judgment on the Pleadings is denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

8. The result reached here accords with the application of respondeat superior in analogous contexts. *See Commercial Bus. Sys. v. BellSouth Serv., Inc.*, 249 Va. 39, 453 S.E.2d 261 (1995) (applying respondeat superior to Virginia's conspiracy to injure others in trade or business statute, Va.Code §§ 18.2–499 and 500, which does not mention of vicarious liability). *See also American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1431 (3d Cir.1994) (applying respondeat superior doctrine to the Lanham Act, 15 U.S.C. § 1125(a), the text of which appears aimed at the direct act of infringement).