No. 99,550

PROGRESSIVE PRODUCTS, INC., *Appellant/Cross-appellee,* v. TOM SWARTZ, MARVIN ROBARTS, CALVIN BUNNEY, and VIN MANUFACTURING, LLC, *Appellees/Cross-appellants.*

(258 P.3d 969)

Opinion filed August 26, 2011.

*Thomas E. Hayes*, of The Spigarelli Law Firm, of Pittsburg, argued the cause, and *Kala Spigarelli* and *Lori Fleming*, of the same firm, were on the briefs for appellant/cross-appellee.

*David S. Brake*, of Henshall, Pennington & Brake, of Chanute, argued the cause, and *Troy A. Unruh*, of Wilbert & Towner, PA, of Pittsburg, was on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

ROSEN, J.: This is an appeal in an action brought under the Kansas Uniform Trade Secrets Act, K.S.A. 60-3320 *et seq.* The defendants, former employees of the plaintiff Progressive Products, Inc. (PPI), challenge the district court finding that they misappropriated protected trade secrets, and, on review before this court, they additionally challenge the remedial procedure that the Court of Appeals directed.

We summarize the facts as follows. In June 1980, Bob Allison approached Roger Messenger about working with his firm, which coated elbow pipes for pneumatic conveyance systems to prolong the lives of those systems. Allison came up with the concept of coating the outside of the pipes instead of the inside in 1974, and, following 2 to 3 years of experimentation, he proved the feasibility of that process. The firm originally used an after-market product that it purchased and applied to piping. Messenger joined the firm as a partner, and he and Allison became the sole owners of PPI after buying out a third owner in 1983.

Enlisting the help of specialists at Pittsburg State University and other chemists, Messenger developed a formula for making a coating compound called Ceram-Back. He developed the formula in part by examining the ingredients list of an after-market product and in part by experimenting with the components until he found a combination that effectively protected the pipes. The formula consisted of ceramic beads, a catalyst, a hardener, and a proprietary fume silica thickener. This combination proved to be much more effective than the original after-market compound.

Messenger devoted about a year and a half to developing the proper formula and amounts to apply to different piping requirements. Allison and Messenger kept the ingredients away from public viewing. They testified that they would throw a tarp over the materials when someone from the outside, such as a vendor, came to the plant. Neither Messenger nor his colleagues ever pursued patenting their product, because patents have a limited lifespan and become open to competitors at the expiration of the patent protection.

Messenger established telephone contacts with potential purchasers and kept a written record of PPI customers, which Allison later entered into a computer database. Messenger also developed a pricing system based on the cost of materials and what the market would bear, and Allison later developed computer programs to facilitate making price quotations based on that system. When Messenger retired in 1999, he sold his interest back to Allison and signed a confidentiality agreement and agreement not to compete for 5 years.

Marvin Robarts worked as a welder for PPI from November 2002 to June 29, 2006. He then began a business called VIN Manufacturing, LLC (VIN), which he started with Calvin Bunney. VIN also used a chemical compound to coat the outsides of elbow pipes. Robarts got the idea for how to mix the coating and the ingredients from his own work at PPI and from Bunney, who had worked as a mixer at PPI. Instead of the proprietary thickener that PPI used in its formula, VIN used a less expensive thickening agent that Robarts found on the Internet. He testified that no one ever told him the PPI formula and process were a secret, that the chemicals

were lying around the PPI shop in the open, and that no one covered up the chemicals when management took customers or vendors on building tours. In fact, employees were allowed to take empty labeled barrels of the materials that went into the PPI formula home for use as trash or burn barrels.

Bunney worked at PPI from January 2001 to June 29, 2006. Like Robarts, he also learned what the Ceram-Back ingredients were from seeing them at the PPI plant. He testified that no one told him that the mixing process was confidential or that the components of Ceram-Back were confidential. He further testified that no measures were taken to keep any employees out of areas where the chemicals were identified and stored and that no measures were taken to conceal the ingredients and mixing supplies from customers during plant tours.

Thomas Swartz worked at PPI as a salesman from March 23, 2003, to August 31, 2005. He testified that he helped with the mixing process four or five times a year, and no one told him that the mixture was secret and confidential. He was, however, directed not to give the Material Safety Data Sheets (MSDS) to customers; these sheets contained the details of the Ceram-Back ingredients. He also testified that everyone at PPI had access to the customer lists and the price lists. Swartz went to work for Robarts and Bunney at VIN and relied on his memory and the Internet to contact customers with whom he had worked at PPI.

William McGinnis, who worked as a temporary employee welder for PPI, and Brenda Caruthers, a secretary/receptionist for PPI, were nondefendants who testified that no one told them that the Ceram-Back materials or process were confidential and secret. They also testified that all the ingredients were left out in the open and were not covered up during the customer tours that they witnessed. Furthermore, the welders were given the work orders that contained pricing and customer information, and the welders were allowed to watch the process of making the Ceram-Back, including the measuring of materials and the application to the pipes.

On July 21, 2006, PPI filed a four-count petition in district court seeking damages under theories based on the Kansas Uniform Trade Secrets Act, breach of fiduciary duty, and intentional inter-

ference with existing and prospective business relationships. PPI filed a separate motion requesting a restraining order and injunction preventing the defendants from manufacturing or using the ceramic formula or using the customer and pricing lists. On the same day, the district court granted the injunctive relief. The defendants subsequently filed an answer in which they asserted counterclaims for abuse of process, improper restraint, and tortious interference with a contract.

Following a bench trial, the district court entered judgment for PPI. The district court determined that PPI possessed a protected trade secret. It did not enjoin the defendants from continuing to market, manufacture, and apply the ceramic coating, but it enjoined the defendants from divulging the formula to other parties for 3 years and required the defendants to pay a 20 percent royalty to PPI for any sales to PPI customers based on the use of the protected process. The court denied the defendants' claims for damages and denied PPI's request for attorney fees.

PPI filed a motion to reconsider, which the court denied. PPI filed a timely notice of appeal challenging the relief it received, and the defendants filed a timely notice of cross-appeal challenging the finding that they had misappropriated a protected trade secret.

The Court of Appeals held that sufficient evidence supported a finding that PPI owned protected trade secrets relating to the formula and the calculation of batch amounts, that the price lists were not trade secrets as a matter of law, and that no evidence supported a finding that the customer lists were a trade secret. The Court of Appeals then concluded that the royalty injunction was not supported by the district court's factual findings and did not comport with the available statutory remedies. *Progressive Products, Inc. v. Swartz*, 41 Kan. App. 2d 745, 205 P.3d 766 (2009). This court granted review as to all issues.

*Discussion*

Kansas enacted the Kansas Uniform Trade Secrets Act in 1981. L. 1981, ch. 214, sec. 1. The Act is short and has been subject to little amendment or appellate litigation. In relevant part, the Act reads as follows:

"K.S.A. 60-3320. As used in this act, unless the context requires otherwise:

"(1) 'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

"(2) 'Misappropriation' means:

(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

"(3) 'Person' means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

"(4) 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

"K.S.A. 60-3321.

"(a) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

"(b) In exceptional circumstances, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time for which use could have been prohibited. Exceptional circumstances include, but are not limited to, a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable.

"(c) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."

"K.S.A. 60-3322.

"(a) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

"(b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)."

"K.S.A. 60-3323. If (i) a claim of misappropriation is made in bad faith, (ii) a motion to terminate an injunction is made or resisted in bad faith, or (iii) willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."

"K.S.A. 60-3324. In an action under this act, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval."

"K.S.A. 60-3326.

"(a) Except as provided in subsection (b), this act displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret.

"(b) This act does not affect:

"(1) Contractual remedies, whether or not based upon misappropriation of a trade secret;

"(2) other civil remedies that are not based upon misappropriation of a trade secret; or

"(3) criminal remedies, whether or not based upon misappropriation of a trade secret."

"K.S.A. 60-3327. This act shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among states enacting it."

As it relates to the present appeal, the Act tells us that it seeks uniformity with other jurisdictions that have adopted the Uniform Trade Secrets Act. In order for PPI to prevail, it was required to

show that the defendants employed theft or breached a duty to maintain secrecy in order to acquire trade secrets that had an independent economic value and that these secrets were not readily ascertainable by proper means by the defendants. PPI would also have had to demonstrate that it made reasonable efforts under the circumstances to maintain the secrecy of the trade secrets. If PPI succeeded in meeting these burdens, the question then became whether the district court made findings, supported by substantial competent evidence, necessary to impose the relief that it granted, most significantly, a royalty injunction.

The Uniform Trade Secrets Act operates in conjunction with patent law to protect developers and legitimate users of new commercial ideas and technology. A key difference between a trade secret and a patent is that the latter is open to public inspection, while the former is maintained in secrecy:

"A patent owner acquires a time limited monopoly over the patented technology, and patent infringement can occur through the use of that technology by any means. The owner of a trade secret, on the other hand, is protected only against improper appropriation of the secret and subsequent use of a secret wrongly acquired. An owner of a trade secret may forgo resort to patent protection, but this choice risks the loss of the secret by voluntary use and disclosure or through legitimate, good faith means, such as reverse engineering." *Evans v. General Motors Corp.*, 51 Conn. Supp. 44, 55-56, 976 A.2d 84 (2007).

Trade secrets are not protected against independent invention. Instead, the law of trade secrets recognizes that private parties invest extensive sums of money in certain information that loses its value when published to the world at large. Based on this logic, trade secret law creates a property right that is defined by the extent to which the owner of the secret protects that interest from disclosure to others. In doing so, the law allows the trade secret owner to reap the fruits of its labor and protects the owner's moral entitlement to these fruits. Trade secret law encourages the development and exploitation of lesser or different inventions than might be accorded protection under the patent laws, but which still play an important part in technological and scientific advancement. Without trade secret protection, organized scientific and technological research could become fragmented, and society as a whole

could suffer. By restricting the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law minimizes the inevitable cost to the basic decency of society when one steals from another. In doing so, trade secret law recognizes the importance of good faith and honest, fair dealing in the commercial world. (Paraphrasing *DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 880-81, 4 Cal. Rptr. 3d 69, 75 P.3d 1 [2003], and the sources cited and quoted therein.)

We now turn to the first issue before us: Did the district court commit reversible error in holding that the defendants misappropriated PPI's trade secrets? In order to resolve this issue, we must determine whether the record and factual findings relating to the existence of a trade secret support the legal conclusion that the defendants misappropriated a trade secret. This presents a mixed question of fact and law, which means that this court reviews the underlying factual findings for substantial competent evidence and reviews the legal conclusions based on those facts de novo. *Boldridge v. State*, 289 Kan. 618, 622, 215 P.3d 585 (2009). When reviewing whether substantial evidence supports a factual finding, this court does not reweigh the evidence, resolve conflicts within the evidence, or pass on the credibility of witnesses. *In re Care & Treatment of Williams*, 292 Kan. 96, 104, 253 P.3d 327 (2011).

PPI alleged that the defendants misappropriated three trade secrets: the formula and mixing process of the ceramic backing, the computerized customer lists, and the computer pricing program. The district court, while not clearly articulating which secrets it considered misappropriated, made several findings that suggested that it agreed with all three parts of the PPI claim:

"10. The most demonstrative act was Swartz obtaining the price sheet for Defendant Robarts at Robarts' request prior to leaving the company and in anticipation and with knowledge that he was going to start his own business known as VIN in direct competition with his employer PPI and in anticipation of contracting known customers of PPI through Swartz's knowledge and contacts and that he gained also working at PPI.

"11. It took PPI years to develop the formula, batching system, the pricing and the ability to interpolate or price any elbow knowing just the size of the elbow.

"12. It took several years for the original owners of PPI to get where they are and to acquire a customer base.

. . . .
"14. That PPI did have a trade secret under K.S.A. 60-3320, and that it included information, a formula, a program, some method or technique of batching, and the quantification of the eight units and the exact formula as pointed out by plaintiffs with regard to the mixture and the ingredients, the pricing method established by them and contained within their computer program, and the price sheet.

"15. Defendant Swartz misappropriated the price sheet at the request of Defendant Robarts during the time when he was employed in anticipation of beginning another business.

"16. VIN is in possession of this trade secret, or at least very important portions of the trade secret, including the exact formula, and all this information was gained during the Defendants' employment at PPI."

The defendants maintain that the district court found only that they had misappropriated the price sheet. Although paragraphs 15 and 16 are ambiguous, in the context of the other factual findings and the remedy, it is evident that the district court included in the misappropriated secrets the price sheet, the formula, and the customer lists.

The critical trade secret is the ceramic formula and the process of applying it to the elbow pipes. The trial testimony indicated that the defendants made little, if any, use of the pricing program or the customer lists, because those were areas of information that they were able to figure out on their own.

The defendants rely on *Webster Engineering and Mfg. Co., Inc. v. Francis*, No. Civ. A. 89-1416-FGT, 1993 WL 406025 (D. Kan. 1993) (unpublished opinion), that declined to find a trade secret when employees had not been informed which information the employer considered confidential. The *Webster* court cited *Electro-Craft Corp. v. Controlled Motion*, 332 N.W.2d 890, Syl. ¶ 6 (Minn. 1983), which discussed the procedures that an employer must use to "signal" the nature of information to its employees. The Minnesota court concluded that if an employer wants to prevent its employees from revealing manufacturing procedures, it has "an obligation to inform its employees that certain information was secret." *Electro-Craft Corp.*, 332 N.W.2d at 902.

While this requirement appears reasonable, the record in the present case contains evidence that PPI made some effort to notify

its employees that the Ceram-Back formula was a secret. Although his testimony was countered by defense witnesses, Pat Damman, PPI president, testified that he informed the defendants that they could not divulge the ingredients to third parties. Damman also testified that the Ceram-Back ingredients, "especially the [proprietary thickener]," were "covered up" when outsiders visited the plant.

The existence of a trade secret is an issue for the trier of fact. See *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1151 (D. Kan. 2007). The statute does not require a particular means of protecting a secret; rather, it requires only that the secret "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." K.S.A. 60-3320(4)(ii). It was for the district court, and is not for us to decide whether PPI made reasonable efforts to protect the secrecy of the formula and the process for making Ceram-Back.

We have no difficulty agreeing with the Court of Appeals that the evidence supported the district court's findings that the formula for Ceram-Back was a protected trade secret. PPI President Damman testified that he told employees that the formula was confidential. PPI sales personnel were instructed not to give MSDS to customers or potential customers. Damman also testified that personnel were instructed to conceal key ingredients, especially the proprietary thickener, from visitors to the plant. Although there was some testimony that the measures taken were loose and not uniformly enforced, the evidence was sufficient to find that the formula was a protected trade secret. The defendants admitted that they did not reverse-engineer the formula and that they based their own formula on what they had learned from PPI. Even though the defendants may not have used the proprietary thickener in their product, the district court could properly find that the Ceram-Back formula itself was a secret and its formulation provided the defendants with the necessary information for producing their own formula. We therefore conclude that the district court did not err in finding that the formula was a protected trade secret. This was the essential trade secret that was misappropriated; it was this formula that allowed the defendants to start a competing business without

investing in the years of experimentation and research that PPI principals had carried out.

We also agree with the Court of Appeals that the district court properly found that the "batch method," or means of calculating the amount of the compound to make up and the cost of that compound, was protected, because PPI had developed a computer program for this purpose that was password protected. The evidence sufficed for a trier of fact to find that the program for calculating material quantities was a trade secret. The formula itself is a mathematical calculation of the area of the pipe to be covered and the number of coats of ceramic protection to be added. Although it may have been nothing more than a spreadsheet for generating numbers from a simple calculation, the program constructed to carry out the calculation was a trade secret because it was a means that PPI developed specifically for calculating production amounts based on its secret formula. The defendants misappropriated this protected trade secret.

The Court of Appeals held that the record contained insufficient evidence to support a finding that the mixing process and the price lists were protected trade secrets. We agree. In particular, the facts that the mixing process was carried out in the open, the marked mixing containers were left in public view, and employees were not specifically instructed that the process was confidential undermined any claims to secrecy about the process. Prices were available to customers, and these customers were free to communicate with each other how much they were paying for certain work.

Having affirmed the district court's determination that the defendants misappropriated the Ceram-Back formula and the batch calculation program, we next must address whether the district court committed reversible error when it ordered a remedy consisting of a 3-year royalty period coupled with other short-term relief. The relief allowed the defendants to continue to operate an elbow-coating business, subject to the conditions that they not divulge the formula to third parties, that they not advertise that they were using a product similar to Ceram-Back, and that they pay PPI a 20 percent royalty for sales made to PPI customers for a period of 3 years.

The Court of Appeals reversed this award, holding that the statutory language and the specific factual findings by the district court did not allow for such injunctive relief. The Court of Appeals concluded that the record contained no evidence of an overriding public interest against broader injunctive relief, no evidence that the defendants acquired the secrets in good faith, and no evidence of other exceptional circumstances that would support a royalty injunction.

Appellate courts will defer to trial courts' determination of whether exceptional circumstances exist that would warrant injunctive relief, because the trial court is in the best position to observe the behavior and demeanor of the witnesses and to gauge their credibility. See *Chilcutt Direct Marketing, Inc. v. A Carroll*, 239 P.3d 179, 183 (Okla. Civ. App. 2010). The decision whether to grant royalty relief once exceptional circumstances are found is subject to review as an abuse of discretion. *Chilcutt*, 239 P.3d at 184. An exercise of discretion, however, must be based on a correct interpretation of the law in order to be protected on appeal. *In re M.F.*, 290 Kan. 142, 150, 225 P.3d 1177 (2010).

K.S.A. 60-3321(b) allows for relief in the form of a royalty injunction. Such an injunction may lie when the district court finds "exceptional circumstances"; those circumstances "include, but are not limited to, a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable."

The district court made no express finding of exceptional circumstances and did not explicitly rely on K.S.A. 60-3321(b). The Court of Appeals examined the record and concluded that the evidence was insufficient as a matter of law to establish exceptional circumstances under K.S.A. 60-3321(b). We cannot agree with this conclusion under the clear statutory language. See *State v. Sellers*, 292 Kan. 117, 128, 253 P.3d 20 (2011) (courts give effect to plain and unambiguous statutory language).

It is unclear what factors might have led the district court to find that exceptional circumstances existed, but three possibilities stand out. First, as the district court noted in its journal entry, PPI was "a bit lax" in protecting the trade secret and in informing its em-

ployees "to what extent they would not allow that information to be transmitted to third parties or anyone else." Evidence in the record certainly supports this finding. No written instructions were given to employees that the formula and process were a secret; there was testimony that the ingredients and mixing containers were left in plain sight of visitors and employees, including those not immediately involved in the mixing process; and employees were not asked to sign confidentiality agreements. Evidence was conflicting on whether employees were orally informed that they were not to reveal the components to third parties. Second, the formula that the defendants used in their process was not identical to the PPI formula. In fact, PPI considered the proprietary thickener to be the "secret ingredient" that made its formula so effective, but the defendants did not use that thickener in their own ceramic-backing compound. Third, evidence was introduced showing that other companies engaged in the pipe-coating business, although it was unknown to what extent their formulae resembled the Ceram-Back formula. Finally, PPI President Damman testified that he did not think that the defendants had taken any business from PPI or cost PPI any revenues during the some 8 months that the defendants marketed their competing services. One measure of monetary relief for misappropriation may be the award of the plaintiff's profit loss. See K.S.A. 60-3322; *Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005); Restatement (Third) of Unfair Competition § 45, comment d (1995). Some of these factors may go to the existence of a protected trade secret, but they may also have contributed to the district judge's finding on whether exceptional circumstances were present that justified a limited-term royalty injunction.

There are no set rules for what constitutes "exceptional circumstances." The comment to § 2 of the Uniform Trade Secrets explains:

"Section 2(b) deals with the special situation in which future use by a misappropriator will damage a trade secret owner but an injunction against future use nevertheless is inappropriate due to exceptional circumstances. Exceptional circumstances include the existence of an overriding public interest which requires the denial of a prohibitory injunction against future damaging use and a person's

reasonable reliance upon acquisition of a misappropriated trade secret in good faith and without reason to know of its prior misappropriation that would be prejudiced by a prohibitory injunction against future damaging use." 14 Uniform Laws Annot., § 2, comment, p. 620 (2000).

In *A & H Sportswear Co. v. Victoria's Secret Stores*, 967 F. Supp. 1457, 1477 (E.D. Pa. 1997), the court concluded that "the essence of the codification is the need to balance harm to the plaintiff with the other equities in a particular case in order to award appropriate relief." The court went on to allow the defendant to continue to use a "Miracle Bra" trademark on swimwear, even though the plaintiff had a preexisting trademark in "Miraclesuit" swimwear on which the defendant's mark impinged, subject to payment of royalties. See also *Newport News Industrial v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 752 (E.D. Va. 2001) (statute requires "case-by-case" analysis of equities to determine appropriate relief); *Electronic Data v. Heinemann*, 268 Ga. 755, 756-57, 493 S.E.2d 132 (1997) (trial court did not abuse discretion in imposing royalty injunction because of public interest in competition, plaintiff's delays in bringing matter to resolution, and adequacy of royalty to protect parties' respective interests).

In the alternative, the district court may have based its decision on K.S.A. 60-3322(a). The district court did not specify the statutory basis of its royalty injunction. K.S.A. 60-3322(a) allows the imposition of royalties in lieu of damages based on actual loss or unjust enrichment. In the present case, PPI conceded that it had not suffered any actual loss, and the defendants testified that they had made a minimal profit of perhaps $400-$450. Under those circumstances, the royalty relief may have been appropriate, and the equitable grounds stated above may have justified the limited injunctive period.

We cannot determine from the record on what factors, if any, the district court relied in finding extraordinary circumstances or on which statutory provision the district court grounded its relief. Ordinarily, absent a proper objection to insufficient factual findings below, this court presumes that the district court found the necessary facts to supports its conclusion. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). When the record on appeal does not

support such a presumption, however, this court must remand for additional factual findings and legal conclusions. *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006).

Because the district court's findings are incomplete, they do not permit meaningful appellate review. We accordingly reverse the Court of Appeals' opinion reversing the remedy that the district court ordered. We remand the case to the district court for the limited purpose of entering an order specifically correlating legal conclusions to facts found in the trial record in a manner consistent with this opinion and relating to the basis for imposing the royalty injunction and other short-term injunctive relief.

The judgment of the Court of Appeals reversing the district court is affirmed in part and reversed in part. The judgment of the district court is affirmed in part and reversed in part, and the case is remanded with directions to the district court.

MORITZ, J., not participating.

DAVID L. STUTZMAN, District Judge, assigned.