NOT DESIGNATED FOR PUBLICATION

No. 116,382

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LENDINGTOOLS.COM., INC.,
*Appellant/Cross-appellee*,

v.

THE BANKERS' BANK, N.A.,
*Appellee/Cross-appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JAMES R. FLEETWOOD and J. PATRICK WALTERS, judges. Opinion filed September 28, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Jay F. Fowler*, *Amy S. Lemley*, *Jim M. Armstrong*, and *Rebekah L. Pinkston*, of Foulston Siefkin LLP, of Wichita, and *Daniel E. Lawrence*, of Fleeson, Gooing, Coulson & Kitch, LLC, of Wichita, for appellant/cross-appellee.

*Lynn D. Preheim* and *Christina Joy Hansen*, of Stinson Leonard Street LLP, of Wichita, for appellee/cross-appellant.


Before GREEN, P.J., MCANANY and BRUNS, JJ.


PER CURIAM: LendingTools.com, Inc. (LendingTools) brought this action against the Bankers' Bank of Kansas, N.A. (BBOK) and The Bankers' Bank, N.A. for misappropriation of alleged trade secrets under the Kansas Uniform Trade Secrets Act, K.S.A. 60-3320 et seq.; civil conspiracy; and tortious interference with contract. In addition, LendingTools asserted a breach of contract claim against the BBOK. Prior to trial, the district court granted summary judgment to the defendants on the tort claims. At

1

the conclusion of a six-week trial, the jury returned a defense verdict on all of the remaining claims.

After this appeal was filed, LendingTools and the BBOK resolved their differences. As a result, the only remaining appellee is The Bankers' Bank. On appeal, LendingTools alleges several errors by the district court. Likewise, The Bankers' Bank has filed a cross-appeal in which it also alleges that the district court committed several different errors. Based on our review of the voluminous record on appeal in light of Kansas law, we affirm in part, reverse in part, and remand this case for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

*The Parties*

LendingTools is a Kansas corporation—headquartered in Wichita—that designs and licenses software systems for use by correspondent banks. A correspondent bank does not provide banking services to the general public. Instead, a correspondent bank is a financial institution that provides services on behalf of another financial institution. Correspondent banks facilitate electronic transfers, conduct business transactions, accept deposits, and perform other services on behalf of another financial institution.

LendingTools began marketing its correspondent banking software—known as Financial Portal Services or FP-S—to customers in 2001. Since that time, LendingTools has improved and refined the software. According to LendingTools, FP-S continues to be the company's primary product, and its sales comprise the majority of its revenues. Also, LendingTools submits that its correspondent banking software is unique in the industry. Moreover, LendingTools asserts that its products and services are proprietary and confidential.

2

The Bankers' Bank is a correspondent bank that provides services to numerous community banks and to other correspondent banks across the United States. The Bankers' Bank, owned by a group of community banks, made its headquarters in Oklahoma City. The Bankers' Bank also develops and licenses software for correspondent banking services. As to this part of its business, The Bankers' Bank and LendingTools are competitors. At no time was The Bankers' Bank a customer of LendingTools nor did the two companies have a contractual relationship.

*The Dispute*

On April 1, 2003, the BBOK—a correspondent bank headquartered in Wichita— entered into a Software Co-Development and Commercialization Agreement with The Bankers' Bank. Together, the two banks developed a software program called Secure Bank Link. The system operated by The Bankers' Bank was known as iWeb and the system operated by the BBOK was known as ABIL Web. Subsequently, on November 28, 2005, the BBOK and The Bankers' Bank entered into an agreement to license the use of correspondent banking software based on iWeb, licensing the software to Compass Bank in November 2005, to Nexity Bank in June 2006, and to Peoples State Bank of Commerce in June 2009.

The BBOK also entered into a Master Services Agreement with LendingTools in August 2006. The BBOK renewed their Master Services Agreement with LendingTools in August 2009. The Master Services Agreement was not renewed when the contractual relationship between the BBOK and LendingTools expired in August 2012. It is undisputed that The Bankers' Bank was not a party to any of the contractual agreements between the BBOK and LendingTools.

In late 2009 and early 2010, First National Bankers Bankshares (FNBB) and United Bankers Bank (UBB) decided to obtain their correspondent banking software

3

from The Bankers' Bank. At the time of their initial discussions with The Bankers' Bank, both FNBB and UBB were using LendingTools correspondent banking software and related services. The parties dispute the nature and extent of the involvement of the BBOK—if any—in the transactions between The Bankers' Bank and the former customers of LendingTools.

*The Litigation*

On May 20, 2011, LendingTools filed a petition in Sedgwick County against the BBOK, alleging breach of contract. Specifically, LendingTools asserted that the BBOK breached the Masters Services Agreement by violating a covenant not to compete and by disclosing confidential information to The Bankers' Bank. On February 27, 2012, LendingTools filed an amended petition adding The Bankers' Bank as a defendant.

On July 2, 2013, LendingTools filed a second amended petition against the BBOK and The Bankers' Bank. In the second amended petition, LendingTools made claims against the BBOK for breach of contract, misappropriation of trade secrets, tortious interference with contract, civil conspiracy, fraud, and breach of implied covenant of good faith and fair dealing. As for its claims against The Bankers' Bank, LendingTools alleged misappropriation of trade secrets, tortious interference with contract, and civil conspiracy.

On July 22, 2013, The Bankers' Bank moved to dismiss the common-law tort claims—tortious interference with contract and civil conspiracy—arguing that these claims are preempted by the Kansas Uniform Trade Secrets Act, K.S.A. 60-3320 et seq. The BBOK also sought dismissal of these claims. On August 23, 2013, the district court denied both motions as premature in the motion to dismiss stage because it did not believe LendingTools had the opportunity to develop any potential claims it may have. Subsequently, the parties requested that the district court assign the case to a specific

4

judge. This motion was granted in an order filed on May 1, 2012, in which Judge J. Patrick Walters was "permanently assigned" to the case.

On December 18, 2013, LendingTools moved for sanctions against The Bankers' Bank alleging spoliation of evidence. In particular, the motion alleged that between June 2010 (when LendingTools sent The Bankers' Bank a demand letter) and February 2012 (when The Bankers' Bank received a copy of LendingTools' amended petition adding The Bankers' Bank as a defendant) The Bankers' Bank deliberately destroyed emails and other documents relevant to the lawsuit. In its demand letter, counsel for LendingTools had requested that The Bankers' Bank

> "not . . . dispose of or destroy any records that relate in any way to the subject matter [of this case]. This includes any written or electronic communications (including any backup or archive copies) between you and any third parties, including but not limited to Bankers['] Bank of Kansas, N.A., First National Bankers' Bankshares, and United Bankers' Bank, concerning LT products or services."

In response to the motion for sanctions, The Bankers' Bank argued that the motion should be denied because its actions were reasonable, not culpable, and did not constitute spoliation of evidence.

Meanwhile, on April 17, 2014, The Bankers' Bank moved for summary judgment on the claims of misappropriation of trade secrets and tortious inference with contract. The district court conducted an evidentiary hearing on the motion for sanctions over several days in May 2014. After considering the evidence and arguments of counsel, the district court granted LendingTools' motion for sanctions against The Bankers' Bank. As a remedy, the district court found that it would give an adverse inference instruction to the jury at trial. The district court also determined that LendingTools was entitled to an award of attorney fees and costs in an amount to be agreed upon by the parties or determined by the court at a later date.

On May 23, 2014, The Bankers' Bank filed a motion to strike LendingTools' rebuttal expert report. Moreover, on June 2, 2014, The Bankers' Bank moved for summary judgment. In this motion, The Bankers' Bank sought judgment as a matter of law on LendingTools' claims against it on the joint venture and civil conspiracy theories. The Bankers' Bank also sought summary judgment on LendingTools' claim for damages for "alleged misappropriation of LT's purported proprietary information or trade secrets, and/or its supposed tortious interference with LT's contractual relations." These motions were argued at a hearing held on July 24, 2014, and later ruled on at an August 12, 2014 hearing. Specifically, Judge Walters' granted summary judgment as to the non-Uniform Trade Secrets Act claims and found that there were significant material facts in dispute as to the Uniform Trade Secrets Act claim and denied summary judgment as to that claim.

On October 6, 2014, the district court entered an order requiring The Bankers' Bank to pay $350,000 in attorney fees and expenses to LendingTools arising out of the motion for sanctions relating to spoliation of evidence. On October 14, 2014, The Bankers' Bank and the BBOK filed a joint motion to exclude certain opinion testimony from Stephen C. Mott and Cheryl Yavornitzki, who were identified as expert witnesses by LendingTools. They also moved to exclude Stephen Mott as an expert witness on damages and to exclude any damage opinion testimony or evidence from him.

In moving to exclude "certain improper opinion testimony from plaintiffs' experts" pursuant to K.S.A. 60-456(b), the defendants argued:

> "LendingTools.com, Inc., the plaintiff, has designated two expert witnesses in this action . . . Stephen Mott, who opines on both liability and damages issues; and Cheryl Yavornitzki, a LendingTools employee and designated liability expert, who has spent most of the last three years of her employment working on this case. Both Mott and Yavornitzki give some opinions that are not proper expert opinions under K.S.A. 60-456(b). The opinions at issue in this motion either (a) are not supported by an adequate foundation in facts and/or (b) are not proper subjects for expert testimony at all."

6

In particular, The Bankers' Bank and the BBOK asked the district court to "reject LendingTools' tender of Stephen Mott as an expert witness on damages. Neither his testimony, nor any evidence based on Mott's opinions, should be admitted in this case."

In early December 2014, the district court held an evidentiary hearing on the joint motion to exclude certain opinion testimony under K.S.A. 2014 Supp. 60-456(b) and the joint motion to Stephen C. Mott as a witness on damages and to exclude his damage opinion testimony or evidence. The district court placed certain limitations on the opinion testimony that LendingTools' experts could render at trial. The district court also determined that Mott was not qualified to testify as an expert on damages and thus ruled that he was precluded from testifying about his damages calculations, methodologies, or theories. Even so, he allowed Mott to testify on other matters. Furthermore, the district court granted LendingTools' request for additional time to designate a new damages expert.

On January 23, 2015, the district court held a hearing at which it considered several matters. Relevant to this appeal, the district court determined that the Kansas Uniform Trade Secrets Act preempts LendingTools' claims for civil conspiracy and tortious interference with contract. Accordingly, the district court granted summary judgment as a matter of law to The Bankers' Bank and the BBOK on these claims.

On March 31, 2015, The Bankers' Bank moved for sanctions against LendingTools, alleging that LendingTools intentionally hid evidence in discovery and destroyed relevant evidence that was prejudicial to its case while the case was pending. The BBOK joined The Bankers' Bank's motion for sanctions on April 7, 2015. The district court denied this motion in a journal entry filed on May 23, 2016, after finding that LendingTools produced the necessary and appropriate documents and that the defendants sustained no injury or damages from any claimed delay in producing the documents.

On June 4, 2015, the district court entered a 34-page agreed pretrial order. The parties agreed—and the district court ordered—that the "Pretrial Order supersedes all pleadings and shall control the trial of this matter." In the pretrial order, LendingTools listed its "Theories of Recovery" against the BBOK to be breach of contract and misappropriation of trade secrets. In addition to seeking substantial monetary relief, including punitive damages, LendingTools sought an injunction against both The Bankers' Bank and the BBOK.

In the pretrial order, The Bankers' Bank denied that it misappropriated LendingTools' alleged trade secrets. Specifically, The Bankers' Bank asserted that none of the information that LendingTools claimed to have been misappropriated was a trade secret under the Kansas Uniform Trade Secrets Act, that there had been no misappropriation, and that LendingTools was not entitled to damages or other relief. Furthermore, The Bankers' Bank asserted that LendingTools should pay its attorney fees under K.S.A. 60-3332(i) for allegedly bringing the misappropriation of trade secrets claim in bad faith.

On July 17, 2015, the district court held a hearing in which it ruled on several pending motions. Significant to this appeal, the district court denied The Bankers' Bank's motion for reconsideration of the sanctions imposed against it for spoliation of evidence and the denial of its motion to strike LendingTools' rebuttal expert report. The district court also denied a motion for additional sanctions filed by LendingTools against The Bankers' Bank for allegedly failing to disclose documents.

LendingTools' filed, on August 18, 2015, a motion for amended findings on its motion for additional sanctions against The Bankers' Bank for spoliation and discovery abuses. A week later, LendingTools moved for change of judge under K.S.A. 20-311(d). On September 2, 2015, the district court reassigned the case from Judge Walters to Judge

Fleetwood. As such, the motion for a change of judge was rendered moot. From that point, Judge Fleetwood ruled on numerous motions prior to trial.

On October 21, 2015, Judge Fleetwood ruled that he would not instruct the jury that certain facts had been proven. Instead, he determined that the standard preliminary instructions would be given to the jury. Additionally, Judge Fleetwood found that "since this court is stepping into the breach so to speak, it wishes to preserve for itself the ability to amend, modify or reconsider any rulings as seen fit based on the progress of the trial and presentation of facts." He then held a case management conference on November 6, 2015, and a status conference on January 26, 2016.

*The Jury Trial and Posttrial Motions*

A six-week jury trial commenced on February 16, 2016. A review of the record reveals that trial counsel for each of the parties zealously advocated on behalf of their respective clients. The record also reveals that Judge Fleetwood diligently strived to maintain an atmosphere of impartiality as he dealt with many difficult evidentiary questions and legal issues presented at trial. Specific testimony or arguments of counsel will be discussed as necessary in the analysis portion of this opinion.

Ultimately, on March 28, 2016, the jury returned a defense verdict on all counts. On the verdict form, the jury was asked: "Do you find that [The Bankers' Bank] misappropriated LendingTools' trade secret information?" The jury answered "No" to this question. The jury was also asked: "Do you find that [The Bankers' Bank] and BBOK entered into a joint venture or partnership for the purpose of selling software, and that this joint venture or partnership misappropriated LendingTools' trade secret information?" Again, the jury answered "No" to this question. The jury also found that the BBOK did not breach its contract with LendingTools.

9

On April 29, 2016, LendngTools filed a motion for a new trial. In the motion, LendingTools argued that a new trial should be granted because of certain remarks and conduct of counsel for the BBOK during his opening statement. The district court filed a journal entry of judgment adopting the jury's verdict on May 16, 2016. Because the journal entry of judgment had not yet been filed when it filed its motion for new trial, LendingTools filed another motion for new trial on May 27, 2016.

The district court held oral argument on the motion on June 30, 2016. After taking the matter under advisement, Judge Fleetwood filed an order on July 14, 2016, denying LendingTools' motion for a new trial. In the order, the district court found "that the curative instructions and . . . prior rulings allowed for a fair, if not perfect, trial for both sides."

*The Appeal*

LendingTools filed its notice of appeal on August 1, 2016. Two days later, the district court filed its journal entry requiring The Bankers' Bank to pay LendingTools $109,222.25 in attorney fees and expenses as sanctions for the spoliation of evidence found prior to trial. The Bankers' Bank agreed to the amount but preserved its objection to the district court's ruling that its pretrial conduct justified sanctions.

On August 8, 2016, The Bankers' Bank filed a motion for findings of fact and conclusions of law regarding the district court's decision to impose sanctions. On August 17, 2016, The Bankers' Bank filed a notice that it deposited $109,222.25 with the clerk of the court. Later, on August 22, 2016, The Bankers' Bank and the BBOK filed notices of cross-appeal. The district court filed additional findings in support of its ruling on sanctions its November 17, 2016.

10

While this appeal was pending, LendingTools and the BBOK resolved their differences. As a result, this court dismissed the BBOK as a party to this appeal on November 28, 2017, and struck its brief from the record. We also note that The Bankers' Bank has filed notices of appeal on October 19, 2016, and December 8, 2016, from the district court's denial of its motion alleging that LendingTools brought this action in bad faith. Those appeals will be addressed in a separate opinion.

ANALYSIS

*Kansas Uniform Trade Secrets Act*

In Kansas, trade secrets are protected from misappropriation under the Kansas Uniform Trade Secrets Act, K.S.A. 60-3320 et seq. The Act—which Kansas adopted in 1981—recognizes that certain information has actual or potential economic value that may be lost if the information is not reasonably protected from disclosure. As in the present case, the issue of whether there has been a misappropriation of a trade secret often involves complex factual and legal questions.

In *Progressive Products, Inc. v. Swartz*, 292 Kan. 947, 954-55, 258 P.3d 969 (2011), the Kansas Supreme Court explained the protections provided under the Act as follows:

> "Trade secrets are not protected against independent invention. Instead, the law of trade secrets recognizes that private parties invest extensive sums of money in certain information that loses its value when published to the world at large. Based on this logic, trade secret law creates a property right that is defined by the extent to which the owner of the secret protects that interest from disclosure to others. In doing so, the law allows the trade secret owner to reap the fruits of its labor and protects the owner's moral entitlement to these fruits. Trade secret law encourages the development and exploitation of lesser or different inventions than might be accorded protection under the patent laws, but which still play an important part in technological and scientific advancement.

11

Without trade secret protection, organized scientific and technological research could become fragmented, and society as a whole could suffer. By restricting the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law minimizes the inevitable cost to the basic decency of society when one steals from another. In doing so, trade secret law recognizes the importance of good faith and honest, fair dealing in the commercial world. (Paraphrasing *DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 880-81, 4 Cal. Rptr. 3d 69, 75 P.3d 1 [2003], and the sources cited and quoted therein.)"

K.S.A. 60-3320(4) defines a "trade secret" as:

"[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

    (i) derives independent economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

    (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Furthermore, K.S.A. 60-3320(2) defines "misappropriation" as:

    "(i) acquisition of a *trade secret* of another by a person who knows or has reason to know that the *trade secret* was acquired by improper means [which is defined in K.S.A. 60-3320(1)]; or

    "(ii) disclosure or use of a *trade secret* of another without express or implied consent by a person who

        (A) used improper means to acquire knowledge of the *trade secret;* or

        (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the *trade secret* was

12

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a *trade secret* and that knowledge of it had been acquired by accident or mistake." (Emphases added.)

Accordingly, if the information alleged to have been misappropriated is not a trade secret, there can be no violation of the Kansas Uniform Trade Secrets Act. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 384-86, 266 P.3d 516 (2011) (quoting *Electro-Craft Corp. v. Controlled Motion*, 332 N.W.2d 890, 897 [Minn. 1983], which stated: "Without a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful."). The existence of a trade secret is an issue for the trier of fact. This includes the question of whether the plaintiff made reasonable efforts under the circumstances to protect the secrecy of the alleged trade secret. *Progressive Products*, 292 Kan. at 957.

*Motion for New Trial*

On appeal, LendingTools contends that the district court should have granted it a new trial based on the remarks and conduct of counsel for the BBOK during his opening statement. In particular, LendingTools argues that it was inappropriate for the BBOK's attorney to show certain archived documents to the jury while claiming that they were "live" on the Internet. It appears that these documents had been posted on the Internet websites of several of LendingTools' customers but had been removed from these

13

websites following the deposition of the Eric Goering—the Chief Executive Officer of LendingTools—on January 22, 2014.

The documents in question contained information that LendingTools claimed to be trade secrets in this case. Before they were removed from the websites of LendingTools' customers, the documents were archived at the direction of counsel for the BBOK and placed on archive.org. Although LendingTools knew that the documents had been on the Internet prior to trial, it evidently did not know that the BBOK's counsel archived them. As such, LendingTools argues that it was prejudiced by the visual demonstration and accompanying remarks of the BBOK's attorney during his opening statement.

In response, The Bankers' Bank points out that it was not involved in the preservation of the documents by counsel for the BBOK. Moreover, The Bankers' Bank contends that Judge Fleetwood handled the issue appropriately when it was brought to his attention and that he did not abuse his judicial discretion in denying LendingTools' motion for new trial. The Bankers' Bank also argues that the BBOK did not manufacture or create evidence. Instead, The Bankers' Bank maintains that the BBOK preserved existing evidence that had been placed on the Internet by third parties and could be accessed by the public.

As the parties recognize, it falls within the discretion of the district court to grant or deny a new trial under K.S.A. 2017 Supp. 60-259(a). Consequently, a ruling on a motion for a new trial will not be disturbed on appeal except upon a showing of abuse of discretion. *Miller v. Johnson*, 295 Kan. 636, 684-85, 289 P.3d 1098 (2012). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the ruling is based on an error of law; or (3) is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

14

Because the motion for a new trial in this case arises out of the remarks and conduct of counsel for the BBOK during his opening statement, we recognize that the Kansas Supreme Court has held:

> "Remarks of counsel are reversible error when, because of them, the parties have not had a fair trial. [Citation omitted]. Of course, the trial court is in a better position than an appellate court to determine whether the verdict resulted from asserted misconduct of counsel or from passion or prejudice, and ordinarily its conclusion in the matter will not be disturbed. [Citations omitted.]" *Kleibrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, 443, 581 P.2d 372 (1978).

See *Sledd v. Reed*, 246 Kan. 112, 117, 785 P.2d 694 (1990). It is with these legal principles in mind that we review the record in this case.

Prior to counsels' opening statements, Judge Fleetwood instructed the jury as follows:

> "Opening statements and closing arguments are from this point on the only opportunity when the attorneys can speak directly to you. In short, an opening statement is their statement of their belief of what will be proved during the course of this trial. A closing argument will be their statement to you as to what they believe they have proved or what has not been proved during the course of the trial. It will be for you to determine whether or not there is sufficient evidence to support their opening statement or closing argument. But the statements they make during their opening statement [and] during their closing argument itself [are] not evidence. It is simply their statement as to what they believe will be proved or has been proved at the end of the case."

The attorneys then gave lengthy opening statements. Speaking first, counsel for LendingTools initially brought up the issue of his client's documents being placed on the Internet by several of the company's customers. Specifically, the attorney for LendingTools told the jury, "Now, one of the issues that you're going to hear about is a defense that LendingTools' software got posted on the Internet." He went on to explain

15

"that some of LendingTools' customers had posted some documents on the Internet that described a portion of the LendingTools software." He then showed the jury a portion of the video recording of CEO Goering's deposition at which he was "confronted with that evidence."

After showing the video, counsel for LendingTools stated that one of the manuals that had been on the Internet did not exist until 2013, which was after the alleged misappropriation of LendingTools' trade secrets had occurred. He indicated that another document on the Internet was a manual created in 2004, which a customer posted around that time to help the customer's users covert to LendingTools' software system. According to LendingTools' attorney, his client was surprised to see that these documents were on the Internet. Moreover, he stated that the postings were "blocked from searchability by most Internet search engines." In addition, he suggested that the documents did not "show up on any searches until after August 2012."

During his opening statement, the attorney for the BBOK also addressed LendingTools' documents that had been placed on the Internet by LendingTools' customers. Toward the beginning of his opening statement, he told the jury that one of the reasons the LendingTools information was not a trade secret was because it was "on the Internet and you're going to see that." He went on to say, "[I]t's huge and you'll see it on the Internet." Specifically, he stated that "things that [LendingTools] never before this case claimed were trade secrets were all over the Internet. Their manuals with all the screenshots and everything were there. You'll see that online—online live with us." He then moved on to discuss other issues.

Later in his opening statement, the BBOK's attorney returned to the subject of the LendingTools documents that were found on the Internet during the course of discovery. He repeated several times that the "online stuff" was "big" and told the jury "the things [LendingTools] now claim were their trade secrets . . . were on the Internet. They were on

16

the Internet for anybody to find." In discussing CEO Goering's deposition, counsel for the BBOK stated that nobody from LendingTools had looked to see what information was on the Internet. "Years into this litigation they were [on the Internet] and we showed them to him."

Counsel then began showing the jury computer images of the LendingTools manual that were placed on the Internet with "[n]o indication of confidentiality whatsoever, voluntarily shared by [LendingTools] with their customers, and [the customers] put it on the Internet for their customers to have access to." According to counsel for the BBOK, the manual was then placed on the Internet "[n]ot behind a log-in, not behind any sort of security . . . ,[but] out there for the whole world to see."

The attorney for the BBOK also indicated that the screen the attorney displayed for the jury was "from a deposition we took of Mr. Goering where we showed him this stuff." Specifically, counsel told the jury that at Goering's deposition, he ran a search on an Internet search engine that pulled up manuals placed on the Internet by two customers of LendingTools "to whom he had given these manuals without telling them they were confidential and they put them on the Internet for the whole world to see."

Counsel for the BBOK told the jury that the LendingTools' documents had been "archived" and suggested that "[o]nce it's out there, it's out there forever." He then told the jury that "what we are looking at . . . right here, right now is live on the Internet." He also told the jury that "the Internet grabbed this and archived it." Once again, he stated that "we're seeing it live on the Internet. It can't be a trade secret, it's on the Internet. These are the keys to their kingdom." Although the record does not reveal how long the BBOK's attorney spent discussing—and showing to the jury—the LendingTools documents that were purportedly "live" on the Internet, the remarks take up approximately 10 pages of the trial transcript.

17

Although the motion for a new trial that is the subject of this appeal is based primarily on the remarks and conduct of the BBOK's attorney during opening statement, we note that LendingTools did not assert a contemporaneous objection. Instead, the issue was not raised to the district court until March 16, 2016, which was the 22nd day of the trial—after LendingTools had rested. Unfortunately, this limited the options available to the district court to address the issue.

LendingTools brought this issue to the attention of the district court by way of a motion for inquiry. The district court heard the initial oral arguments on the motion for inquiry outside the presence of the jury on March 23, 2016. During this hearing, counsel for the BBOK stated that "[t]he decision was made [to preserve the LendingTools documents on the Internet] when those items were found . . . and that was the instruction given to staff." At the hearing, Judge Fleetwood indicated that he was "not questioning the appropriateness of archiving" the documents and found the situation to be like an attorney directing "that all paper memos and such would be . . . saved." Still, the district court was concerned with the remarks made to the jury about the LendingTools documents being "live" on the Internet.

At no time did LendingTools request a mistrial. Instead, counsel for LendingTools argued that the issue should "be handled either in an instruction or by evidence to establish the person or entity who placed it out there for the world to see." Specifically, LendingTools' attorney suggested that "the appropriate way is for the Court to identify that [the documents were] placed [on the Internet] at the direction of counsel for BBOK." In response, the BBOK's attorney pointed out to Judge Fleetwood that his client had supplied LendingTools with an exhibit list and copies of trial exhibits in June 2015 that included the URL—Uniform Resource Locator or Internet address—of each of the archived documents.

18

The next day, the district court once again considered LendingTools' argument regarding opening statements. Outside the presence of the jury, counsel for LendingTools requested that the district court give an instruction to the jury stating—among other things—"that information shown to you during opening statement was placed on Archive.org at the direction of counsel for BBOK. You must disregard the demonstration of LendingTools' trade secret protected information shown in opening statement and all statements of counsel touching on the demonstration." Counsel for the BBOK also presented a proposed instruction to address the situation. As a compromise, counsel for The Bankers' Bank suggested an alternative instruction in which the district court would tell the jury that it should "disregard any argument or evidence that . . . these things were on[line] after that certain date in January of 2014 and just leave it at that."

The district court determined that counsel for the BBOK did not have "an improper motive" in directing his staff to archive the LendingTools documents found on the Internet. Even so, the district court found that it was inappropriate for the BBOK's attorney to tell the jury that the LendingTools documents being shown during his opening statement were "live on the Internet" and "out there for the whole world to see." Before the final ruling was made, counsel for LendingTools argued to the district court that "we need to have a curative instruction" due to the prejudicial aspects of the opening statement of counsel for the BBOK.

Ultimately, the district court decided to give the following instruction to the jury:

> "You are instructed that immediately after Eric Goering's deposition on January 22, 2014, the First Carolina iCaps manual exhibit 930, Kansas Corporate Credit Union Slide Show, exhibit 932 as well as the MIB manual 931 were permanently removed from the internet."

This instruction was given as Instruction No. 2 and it immediately followed an instruction that stated, in part:

19

"Statements and arguments of counsel, are not evidence, but may help you understand the evidence and apply the law. However, you should disregard any comments by counsel that are not supported by evidence."

After the jury returned a verdict for the defendants, LendingTools sought a new trial. Relevant to this issue, LendingTools argued in its motion for a new trial that "[p]rejudice was ignited by misconduct from counsel for the BBOK during opening statement, fed by other improper statements of defense counsel, and eventually insured by an inadequate instruction addressing the Internet posting which was given by the Court after the case was concluded." In their responses to the motion for a new trial, The Bankers' Bank and the BBOK argued that LendingTools had received a fair trial.

Following oral arguments on the motion for a new trial held on June 30, 2016, the district court took the motion for a new trial under advisement. On July 14, 2016, Judge Fleetwood entered a written order denying LendingTools' request for a new trial. In the order, he stated that "[t]he court remains of the opinion that [the curative] instruction [combined] with the standard PIK instruction directing the jury to 'disregard any comments by counsel that are not supported by evidence' is sufficient" to alleviate the potential prejudice arising from the inappropriate statements made by counsel for the BBOK in his opening statement.

The first argument presented by LendingTools on appeal is that the "'live' demonstration of [LendingTools'] confidential information [during opening statement] was based upon misrepresentation and improper conduct by defendants and their counsel, which corrupted the verdict." Specifically, LendingTools argues that the district court should have granted its motion for a new trial because the jury verdict was given under the influence of passion and prejudice and was contrary to the evidence. See K.S.A. 2017 Supp. 60-259(a)(1)(C) and (D). Additionally, LendingTools argues that it was not given a

20

reasonable opportunity to present evidence to rebut the statements of the attorney for the BBOK during his opening statement. See K.S.A. 2017 Supp. 60-259(a)(1)(A).

We note that LendingTools also argues that it is entitled to a new trial because the jury's verdict was procured by corruption of the party that obtained the verdict. K.S.A. 2017 Supp. 60-259(a)(1)(F). However, it is important to recognize that the remarks and conduct during the opening statements that are in question were made or performed by counsel for the BBOK—not by counsel of The Bankers' Bank. As noted above, the BBOK resolved its differences with LendingTools while this appeal was pending and it is no longer a party to this case. Because LendingTools has not shown that the jury verdict was procured by corruption on the part of The Bankers' Bank, we conclude that K.S.A. 2017 Supp. 60-259(a)(1)(F) is not applicable to the issue currently presented in this appeal.

Nevertheless, we find that a new trial is appropriate under the unique circumstances presented in this case. We recognize that the law guarantees to every litigant a fair—but not a perfect—trial. See *Hurlbut v. Conoco, Inc.*, 253 Kan. 515, 539, 856 P.2d 1313 (1993) (citing *Schneider v. Washington National Ins. Co.*, 204 Kan. 809, 815, 465 P.2d 932 [1970]). We also recognize that the remarks of counsel—whether made in opening statements, during closing arguments, or at other times during the course of a trial—are not evidence. *Bullock v. BNSF Railway. Co.*, 306 Kan. 916, 933, 399 P.3d 148 (2017) (citing *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 [2011]). Even so, the remarks and conduct of counsel at trial can result in reversible error when they lead to an unfair trial. *Kleibrink*, 224 Kan. at 443; see *Sledd*, 246 Kan. at 117.

Although this is a difficult issue and we appreciate the efforts made by the district court to try to fashion a remedy to cure the problem, we are convinced based on our review of the record that the remarks of the BBOK's attorney during his opening statement fatally infected the trial. Unfortunately, Instruction No. 2 failed to overcome

21

the assertion that the alleged trade secrets were still "live" on the Internet at the start of the trial. This is particularly true here because one of the primary defenses presented by both the BBOK and The Bankers' Bank at trial was that LendingTools failed to take reasonable steps to protect the secrecy of the documents that it claimed to be trade secrets.

Instruction No. 2 tried to cure the problem created by counsel for the BBOK, but it did not go far enough. The instruction indicated that the documents had been "permanently removed from the internet." In reality, the documents had been preserved on the archive.org website at the direction of the BBOK's attorney. Specifically, Instruction No. 2 failed to inform the jury that the computer demonstration it witnessed during opening statement was not actually "live on the Internet" in the way it was suggested to it by counsel for the BBOK. Furthermore, the instruction did not tell the jury that while LendingTools had attempted to have the documents removed from the Internet, the BBOK's attorney had directed his staff to preserve them on the Internet.

We understand that it was the attorney for the BBOK—and not counsel for The Bankers' Bank—who made the inappropriate statements during opening statements. Even so, the damage was done and the entire trial was tainted as a result. Thus, we conclude that the remarks and conduct of the BBOK's counsel denied LendingTools a fair trial.

*Failure to Enter Default Judgment as a Sanction*

LendingTools next contends that the district court erred in failing to impose default judgment against The Bankers' Bank as a sanction for spoliation of evidence. LendingTools filed at least two motions for sanctions against The Bankers' Bank, and this issue involves the second motion for sanctions. LendingTools also argues that the district court erred as a matter of law when it stated in an order entered on May 23, 2016, that LendingTools' request for default judgment was "rendered moot upon submission of [the]

22

question [of liability] to the jury." LendingTools requests that we remand for this case to the district court so it can "freshly decide" whether to impose default judgment against The Bankers' Bank as a sanction.

The parties recognize that the decision to impose sanctions for alleged discovery abuses rests within the sound discretion of the district court. See *Schoenholz v. Hinzman*, 295 Kan. 786, Syl. ¶ 11, 289 P.3d 1155 (2012). As a result, we review this issue to determine whether the district court abused its discretion. See *In re Marriage of Bergmann & Sokol*, 49 Kan. App. 2d 45, Syl. ¶ 2, 305 P.3d 664 (2013). In other words, we must determine whether no reasonable judicial officer would rule as the district court did under the circumstances, whether the district court ignored controlling facts or relied on unproven representations, or whether the district court acted outside the applicable legal framework. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

LendingTools originally requested sanctions against The Bankers' Bank for this specific conduct in a memorandum of law in support of additional sanctions against The Bankers' Bank filed on June 15, 2015. Judge Walters denied the motion on the record and entered a minute order on July 22, 2015, without further explanation. After the case was transferred to Judge Fleetwood, he again took up the matter at a hearing held on January 5, 2016.

At the hearing, Judge Fleetwood ruled on the record as follows:

"[I]t appears to me that the management of these storage sites and document sites was poorly done. The existence of them and the apparent contact of them is something that was discovered only through some laborious work done by attorneys and expert witnesses in trying to do forensic efforts, and discovering the content of them. *I will grant a sanction as to attorney fees and costs related in that forensic effort*." (Emphasis added.)

23

Later, the district court found, "I will *allow the costs and fees* associated with that. *There will be no other sanction related*." (Emphases added.) In addition to making this ruling prior to trial, the district court also stated that it would give an adverse inference instruction based on PIK Civ. 4th 102.73 to the jury at trial.

Based on our review of the record, we find that the district court had already decided before the start of the jury trial what remedies it desired to impose as a sanction for the alleged spoliation of evidence. In particular, the district court had decided to impose attorney fees as a sanction and to give an adverse inference instruction to the jury. Although the amount of the attorney fees was left open until after the completion of the jury trial, it is apparent that the district court did not desire to impose the harsh penalty of a default judgment as a sanction. We also find the type of sanctions imposed by the district court to be reasonable. Accordingly, we conclude that the district court did not abuse its discretion in failing to enter default judgment as a sanction against The Bankers' Bank.

*Reasonable Efforts Instruction*

LendingTools contends that the district court erred in giving the jury Instruction No. 19, which stated:

> "In order to prove that it made 'reasonable efforts' to maintain the secrecy of a trade secret, a plaintiff claiming trade secret misappropriation must have identified the trade secret and made it clear to the recipient involved that there was an obligation to maintain the secrecy of the alleged trade secret."

Here, LendingTools properly preserved the issue for appeal by objecting in writing to the instruction proposed by the defendants as well as objecting again at the instruction conference. LendingTools also argued in its motion for a new trial that it was entitled to a new trial because Instruction No. 19 was erroneously given. See K.S.A. 2017 Supp. 60-

24

251(d)(1)(A). Thus, we must determine if the instruction was legally appropriate—using an unlimited standard of review—and whether there was sufficient evidence—viewed in the light most favorable to the requesting party—to support the giving of the instruction. Finally, if we determine that the district court erred, we must decide whether the error was harmless—using the test and degree of certainty set forth in *Ward*, 292 Kan. 541. *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

We find Instruction No. 19 to be both troublesome and confusing. As shown above, one of the elements of a trade secret under the Kansas Uniform Trade Secrets Act is that the information claimed to be protected "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." K.S.A. 60-3320(4)(ii). This was adequately explained to the jury in Instruction No. 15. However, Instruction No. 19 attempts to define reasonable efforts to require that a person or entity claiming a trade secret to specifically identify the secret information and to make it clear that there is an obligation to maintain its secrecy. These may be reasonable steps to take to protect ones trade secrets but they are not required under the plain and unambiguous language of the Kansas Uniform Trade Secrets Act.

In *Progressive Products*, 292 Kan. at 957, the Kansas Supreme Court found that K.S.A. 60-3320(4)(ii) "does not require a particular means of protecting a secret; rather, it requires only that the secret 'is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" Accordingly, our Supreme Court upheld a finding of misappropriation of a trade secret even when "[n]o written instructions were given to employees that the formula and process were a secret," and "[e]vidence was conflicting on whether employees were orally informed that they were not to reveal the components to third parties." 292 Kan. at 960.

In determining whether reasonable efforts under the circumstances were undertaken, a factor that may be considered to prove a trade secret is that the person or

25

entity asserting to protect the information has specifically identified that information to be secret upon dissemination to employees, customers, or others. However, this factor is not necessarily determinative. Thus, we do not find Instruction No. 19 to be legally appropriate.

Of course, the first question that should be answered in a misappropriation case is whether the information that the plaintiff desires to protect is in fact a trade secret as defined by K.S.A. 60-3320(4). If not, there can be no misappropriation of a trade secret under the Kansas Uniform Trade Secrets Act. See *Wolfe Electric*, 293 Kan. at 385. To help the jury determine whether the information constitutes a trade secret under the Act, simply instructing the jury of the definition set forth in K.S.A. 60-3320(4)—as was done here in Instruction No. 15—should be sufficient in many cases. Unfortunately, PIK Civ. 4th does not include pattern trade secret instructions, which would have been helpful to the district court in presiding over this case.

If a district court believes it is necessary to provide additional guidance to the jury regarding whether the information is a trade secret, as defined in the Kansas Uniform Trade Secrets Act, it may want to consider giving instructions similar to those set forth in the Judicial Council of California Civil Jury Instructions (CACI) §§ 4403 and 4404 (2018). We note that California has also adopted the Uniform Trade Secrets Act, including the definition of a trade secret that is substantially similar—although not identical—to the definition found in K.S.A. 60-3320(4). See Cal. Civ. Code § 3426.1(d) (2012).

As for the "Secrecy Requirement" under the uniform act, CACI § 4403 states:

"The secrecy required to prove that something is a trade secret does not have to be absolute in the sense that no one else in the world possesses the information. It may be disclosed to employees involved in [*name of plaintiff*]'s use of the trade secret as long as

26

they are instructed to keep the information secret. It may also be disclosed to nonemployees if they are obligated to keep the information secret. However, it must not have been generally known to the public or to people who could obtain value from knowing it."

Likewise, regarding the "Reasonable Efforts to Protect Secrecy" requirement, CACI § 4404 states:

"To establish that the [*select short term to describe, e.g., information*] [is/are] [a] trade secret[s], [*name of plaintiff*] must prove that [he/she/it] made reasonable efforts under the circumstances to keep it secret. 'Reasonable efforts' are the efforts that would be made by a reasonable [person/business] in the same situation and having the same knowledge and resources as [*name of plaintiff*], exercising due care to protect important information of the same kind. [This requirement applies separately to each item that [*name of plaintiff*] claims to be a trade secret.]

"In determining whether or not [*name of plaintiff*] made reasonable efforts to keep the [*e.g., information*] secret, you should consider all of the facts and circumstances. Among the factors you may consider are the following:

"[a. Whether documents or computer files containing the [*e.g., information*] were marked with confidentiality warnings;]
"[b. Whether [*name of plaintiff*] instructed [his/her/its] employees to treat the [*e.g., information*] as confidential;]
"[c. Whether [*name of plaintiff*] restricted access to the [*e.g., information*] to persons who had a business reason to know the information;]
"[d. Whether [*name of plaintiff*] kept the [*e.g., information*] in a restricted or secured area;]
"[e. Whether [*name of plaintiff*] required employees or others with access to the [*e.g., information*] to sign confidentiality or nondisclosure agreements;]
"[f. Whether [*name of plaintiff*] took any action to protect the specific [*e.g., information*], or whether it relied on general measures taken to protect its business information or assets;]

27

"[g. The extent to which any general measures taken by [*name of plaintiff*] would prevent the unauthorized disclosure of the [*e.g., information*];]

"[h. Whether there were other reasonable measures available to [*name of plaintiff*] that [he/she/it] did not take;]

"[i. Specify other factor(s).]

"The presence or absence of any one or more of these factors is not necessarily determinative."

We find these instructions adopted by the Judicial Council of California to be an example of legally appropriate instructions that clarify the types of factors a jury may consider in determining whether a plaintiff has met its burden to prove the existence of a trade secret as defined by the Kansas Uniform Trade Secrets Act. Unfortunately, we do not find that Instruction No. 19 provides that clarification. Instead, we find Instruction No. 19 to be legally inappropriate because—while it identifies a factor that may constitute reasonable efforts to maintain secrecy—it suggests that this factor is required to establish a trade secret under the Act. We also do not find Instruction No. 19 to be harmless. In particular, we find that the language of the instruction is troubling when viewed in light of the inappropriate remarks and conduct of counsel for the BBOK during opening statements.

*Limiting Trade Secret Claims*

LendingTools also contends that the district judge who originally handled the pretrial proceedings erred in sua sponte limiting the trade secret claims it could present to the jury in this case. According to LendingTools, the district judge's ruling was the equivalent of entering summary judgment without following the appropriate procedure. We agree.

28

We note that The Bankers' Bank does not address this issue in its briefs. Instead, it merely states that it adopts the arguments set forth in the BBOK's brief on this issue. However, as indicated above, the brief filed by the BBOK was stricken from the appellate record after it was dismissed as a party in this case.

Moreover, we find it is unclear from a review of the record on appeal how or why the district court reached its decision to limit LendingTools' trade secrets claims. At the very least, it appears that the appropriate procedure was not followed for the granting of summary judgment. See K.S.A. 2017 Supp. 60-256 and Kansas Supreme Court Rule 141 (2018 Kan. S. Ct. R. 205). Instead, it appears that Judge Walters decided this issue at a status conference on May 29, 2015. Prior to the conference, The Bankers' Bank had filed a motion to continue the trial in which it argued that LendingTools' claims for misappropriation had increased from 9 alleged trade secrets—7 individual items and 2 compilations—to more than 100 when its expert witness filed a supplemental report alleging the misappropriation of 92 additional trade secrets.

Although the motion for continuance requested additional time to respond to these new allegations, it does not appear that either The Bankers' Bank or the BBOK filed a partial summary judgment motion relating to this issue. Specifically, The Bankers' Bank argued that LendingTools had waited until approximately 90 days before trial to identify these additional alleged trade secrets in a lawsuit that had been pending for 4 years. In response, LendingTools argued that it had adequately disclosed its alleged trade secrets during the course of discovery. It is, however, unclear from the record on appeal exactly what LendingTools was claiming to be individual trade secrets as opposed to part of a compilation trade secret claim.

At the status conference, LendingTools' expert testified, but she did not offer much clarity to the situation. At first, the expert indicated that nine items listed in her original report were "a compilation of what was taken" and were "all part of the same trade

secret." However, she then stated that the first seven items listed in her original report were individual trade secret claims while the last two mentioned were compilation claims. Finally, she testified that the 92 items listed in her supplemental report were part of LendingTools' compilation claim.

Although Judge Walters denied the motion for continuance, he determined that LendingTools would be limited to a compilation trade secret claim and would be precluded from presenting any individual trade secret claims. In ruling from the bench, Judge Walters stated:

> "All right. Ready to write my ruling down? I guess you will probably just order the transcript. I'm going to—I'm already going to, based on the argument and the—from counsel that they have made a—I assume they have made an oral request to quash the LendingTools' supplemental expert disclosures. That is denied. I will allow the expert disclosures. I'm going to specifically rule that the expert disclosures are limited to a compilation of the trade secret that was at issue in this case. *I will preclude the plaintiff from alleging that these are individual trade secrets in any way, shape, or form. Either by hybrid or individually.*" (Emphasis added.)

Thus, it seems that Judge Walters ruled on this significant legal issue without giving the parties any notice that he was considering granting partial summary judgment. Likewise, it does not appear that he did issued findings of fact or conclusions of law. Perhaps LendingTools trade secret claims should be limited. However, we find that the procedure utilized by the district court to make this determination was inappropriate. Thus, we reverse and remand this matter to the district court for further consideration using an appropriate procedure.

*Preemption of Tort Claims*

LendingTools further contends that the district court erred in finding that the Kansas Uniform Trade Secrets Act preempts its claims for tortious interference with

contract and civil conspiracy. In particular, LendingTools argues that it should have been able to present its tort claims at least as an alternative theory of recovery. In response, The Bankers' Bank argues that K.S.A. 60-3326 bars tort claims based upon the same facts as a misappropriation of trade secret claim.

Evidently, this issue came before the district court on a motion for summary judgment filed by the defendants. Regrettably, we can find no journal entry or other written order in the record on appeal relating to this issue. Rather, it appears that Judge Walters also ruled on this significant issue from the bench. In doing so, it appears that he applied a blanket prohibition on the presentation of other tort claims to the jury regardless of whether they were seeking damages for trade secrets or nontrade secrets.

In *Wolfe Electric*, 293 Kan. at 401-02, the Kansas Supreme Court found that certain tort claims are preempted by the Kansas Uniform Trade Secrets Act. In *Wolfe Electric*, our Supreme Court found that whether tort claims asserted in a trade secret case are preempted by the Kansas Uniform Trade Secrets Act requires statutory interpretation and is a question of law subject to de novo review. 293 Kan. at 400 (citing *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 1, 218 P.3d 400 [2009]). The fundamental rule of statutory interpretation is that legislative intent governs if it can be determined. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

To determine the Legislature's intent, "statutory language is an appellate court's paramount consideration because the best and only safe rule for ascertaining the intention of the makers of any written law is to abide by the language they have used." *In re Estate of Strader*, 301 Kan. 50, Syl. ¶ 3, 339 P.3d 769 (2014). As such, we first consider the plain language of the statute by giving common words their ordinary meanings. When the plain language of the statute is unambiguous, we are not to "speculate as to the legislative intent behind it and will not read into the statute something not readily found in it." *Cady v. Schroll*, 298 Kan. 731, 738-39, 317 P.3d 90 (2014).

31

K.S.A. 60-3326 states:

"(a) Except as provided in subsection (b), this act displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret.

"(b) This act does not affect:

(1) Contractual remedies, whether or not based upon misappropriation of a trade secret;

(2) other civil remedies that are not based upon misappropriation of a trade secret; or

(3) criminal remedies, whether or not based upon misappropriation of a trade secret."

In addressing this statutory language in *Wolf Electric*, our Supreme Court noted:

"According to one commentator, '[t]he drafters [of Section 7 of the Uniform Trade Secrets Act, identical to K.S.A. 60-3326] explicitly abrogate other civil remedies based on misappropriation of a defined trade secret and, among the courts, there seems to be little dispute that the UTSA did, in fact, intend to abrogate other civil remedies when a claim involves misappropriation of a trade secret.' Comment, *I Have a Secret?: Applying the Uniform Trade Secrets Act to Confidential Information That Does Not Rise to the Level of Trade Secret Status,* 12 Marq. Intell. Prop. L. Rev. 359, 367 (Summer 2008); see, *e.g., BlueEarth Biofuels v. Hawaiian Elec. Co.*, 123 Hawaii 314, 318, 235 P.3d 310 (2010) (stating that '[c]ourts that have considered the UTSA's preemption provision have "uniformly interpreted [it] to preempt previously existing misappropriation of trade secret actions, whether statutory or common law" [Citations omitted.]')." 293 Kan. at 401.

Accordingly, our Supreme Court concluded in *Wolf Electric* that the Kansas Uniform Trade Secrets Act "limits recovery for trade secrets only" and that "tort causes of action cannot include a claim to recover for trade secrets [because the Act] is the exclusive remedy." 293 Kan. at 402. In other words, to the extent that a plaintiff is seeking to recover for the misappropriation of a trade secret, the Kansas Uniform Trade Secrets Act preempts all other tort remedies. However, our Supreme Court did not

32

address the issue of whether the Act also preempts "other tort causes of action for recovery of damages for nontrade secrets." 293 Kan. at 403.

On its face, K.S.A. 60-3326(a) only displaces or preempts law that conflicts with the Kansas Uniform Trade Secrets Act. The statute goes on to expressly provide that it "does not affect . . . other civil remedies that are not based on misappropriation of a trade secret." K.S.A. 60-3326(b)(2). In order for the Kansas Uniform Trade Secrets Act to apply, it must first be determined whether the information a plaintiff seeks to protect is a trade secret as the term is defined by K.S.A. 60-3320(4). If the Kansas Uniform Trade Secrets Act does not apply, then other civil remedies cannot be in conflict with the Act. Thus, based on the plain language used in these statutes, we conclude that while the Kansas Uniform Trade Secrets Act provides the exclusive remedy for civil claims based on the misappropriation of a statutorily defined trade secret, it does not preempt tort claims based on the misappropriation of information that falls outside of the statutory definition of a trade secret.

We recognize there is a split of authority regarding the scope of preemption or displacement in the jurisdictions that have adopted the Uniform Trade Secrets Act. This "fundamental discord among courts" occurs in deciding whether the Act only preempts tort actions relating to information "qualifying as a trade secret under the [statutory] definition" or whether the Act also preempts tort actions of information alleged to be secret "regardless of whether it rises to the level of a trade secret [under the Act]." Comment, *An Immodest Proposal: How the Kansas Supreme Court Can Unify the Uniform Trade Secret Act's Preemption of Common Law Claims*, 60 Kan. L. Rev. 1147, 1156-57 (2012). This split of authority appears to result from the rules of statutory interpretation applied by the particular court deciding the issue.

On the one hand, courts applying a literal or plain language reading of the preemption provision have concluded that it does not apply to information that does not

33

rise to the level of a statutorily defined trade secret. Consequently, if the information does not meet the statutory definition of a trade secret, then a plaintiff is free to pursue other civil remedies. See *Burbank Grease Services, LLC v. Sokolowski*, 294 Wis. 2d 274, 281, 717 N.W.2d 781 (2006) (plain language of Uniform Trade Secrets Act does not preempt civil remedies based on misappropriation of confidential information that falls outside of statutory definition of a trade secret); accord *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 726-27 (D. S.C. 2007); *Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co., Inc*, 191 F. Supp. 2d 652, 658-59 (E.D. Va. 2002). We believe that this interpretation of the Act is consistent with the Kansas Supreme Court's direction that we should not speculate as to the legislative intent behind a statute or attempt to read something into the statute that is not readily apparent on its face. *Cady*, 298 Kan. at 738-39.

On the other hand, several courts have concluded that the Uniform Trade Secrets Act should be interpreted broadly. As a result, these courts have held that the Act preempts most—if not all—tort claims seeking to protect allegedly secret information regardless of whether it meets the statutory definition of a trade secret. See, e.g., *Opteum Financial Services, LLC v. Spain*, 406 F. Supp. 2d 1378, 1380-81 (N.D. Ga. 2005) (plaintiff was not entitled to pursue tort claims regarding information it alleged was a trade secret); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 971 (N.D. Ill. 2000); *AirDefense, Inc. v. AirTight Networks, Inc.*, No.C 05-04615JF, 2006 WL 2092053, at *2 (N.D. Cal. 2006) (unpublished opinion) (claims based on the same factual allegations as claims for misappropriation of trade secrets are preempted); *Mortgage Specialists, Inc. v. Davey*, 153 N.H. 764, 777, 904 A.2d 652 (2006). Although there may be valid public policy reasons to interpret the preemption provision so broadly, it is not the role of this court to add to the clear statutory language adopted by the Kansas Legislature.

In this case, LendingTools has essentially pleaded alternative theories of relief. Its primary theory of relief is that The Bankers' Bank misappropriated information protected

as trade secrets under the Kansas Uniform Trade Secrets Act. In the alternative, LendingTools seeks to alternatively recover damages under the theories of tortious interference with contract and civil conspiracy. Even if the jury determines that the information is not a trade secret under the Act, it is possible that it may still be able to recover on its tort claims if it can come forward with sufficient evidence to prove the elements of its tort claims.

Hence, we find that even if the district court had followed the proper procedure to grant partial summary judgment in favor of The Bankers' Bank on the ground that its tort claims were preempted under K.S.A. 60-3326, such a ruling would have been premature. Specifically, we find that it was premature for the district court to make a decision regarding preemption before the jury determined whether the information that LendingTools sought to protect met the statutorily definition of trade secret set forth in K.S.A. 60-3320(4). See *Stone Castle Financial*, 191 F. Supp. 2d at 659 ("unless it can be clearly discerned that the information in question constitutes a trade secret, the [c]ourt cannot dismiss alternative theories of relief as preempted by the [Uniform Trade Secrets Act]"); accord *AMID, Inc. v. Medic Alert Foundation United States, Inc.*, 241 F. Supp. 3d 788, 826-27 (S.D. Tex. 2017). Because it cannot be established from the record on appeal whether the information at issue in this case is a trade secret as defined by K.S.A. 60-3320(4), we cannot determine at this point whether LendingTools' alternative claims are preempted.

Finally, we note that The Bankers' Bank argues in its brief that even if this court concludes that LendingTools' claims for tortious interference with contract and civil conspiracy are not preempted, the "inability to bring the tort claims was at most harmless error, and does not provide a basis for reversal." Specifically, The Bankers' Bank argues that "summary judgment should have been entered for Defendants on the merits" because LendingTools "could not prove the necessary elements to support those claims."

Once again, we are at a disadvantage since it appears that the district court never reached this issue because it found that LendingTools' tort claims were preempted by the Kansas Uniform Trade Secrets Act. Although we find summary judgment on the preemption issue to be premature, we conclude that it is appropriate for the district court to address the merits of the summary judgment motion filed by The Bankers' Bank on remand. Specifically, the district court should determine whether LendingTools has come forward with sufficient evidence to establish the necessary elements to support a claim for tortious interference with contract as set forth in *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423, 77 P.3d 130 (2003). Likewise, the district court should determine whether LendingTools has come forward with sufficient evidence to establish the necessary elements to support a claim for civil conspiracy as set forth in *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, Syl. ¶ 2, 811 P.2d 1220 (1991); see *Central National Bank v. Estate of Weber*, No. 116,109, 2017 WL 6547041, at *2 (Kan. App. 2017) (unpublished opinion).

On remand, unless the district court determines that summary judgment can be entered on these claims for a reason other than preemption, the first question the jury should be asked on the verdict form is whether any of the information LendingTools seeks to protect is a "trade secret" as that term is defined in the Kansas Uniform Trade Secrets Act. If the jury determines that any of the information is a trade secret, LendingTools would be barred under K.S.A. 60-3326 from recovery on its tort claims as to that information and the jury should be instructed to move on to the question of whether The Bankers' Bank misappropriated any trade secrets. However, if the jury determines that some or all of the information are not trade secrets, it should be instructed to consider LendingTools' tort claims as to that information.

36

*Designation of New Damages Expert*

In its cross-appeal, The Bankers' Bank contends that the district court abused its discretion by allowing LendingTools to designate a new damages expert more than a year after its expert disclosure deadline and well after the close of discovery. Specifically, The Bankers' Bank argues that the district court's decision "effectively punished" it for filing a successful motion to strike Lending Tools' original damages expert. The Bankers' Bank also argues that the district court's decision gave LendingTools the opportunity to find a "better" expert and gave it a "*Daubert* do-over" resulting in a disservice to the orderly administration of justice. In response, LendingTools contends that the district court did not abuse its discretion. Likewise, LendingTools points out that district courts are given broad discretion to control discovery in civil cases, including setting deadlines for the designation of expert witnesses.

The parties agree that we are to review the issue of whether the district court erred in allowing LendingTools to belatedly designate a new damages expert under an abuse of discretion standard. Indeed, district courts have broad discretion in supervising the course and scope of discovery. *Miller v. Johnson*, 295 Kan. 636, 688, 289 P.3d 1098 (2012). Likewise, the admission of expert testimony generally lies within the trial court's sound discretion, and its decision will not be overturned in the absence of an abuse of discretion. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 444, 228 P.3d 1048 (2010). As indicated above, a judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) is based on an error of law; or (3) is based on an error of fact. *Wiles*, 302 Kan. at 74.

Here, there is no allegation that the district court erred as a matter of law or that it based its decision to grant LendingTools leave to designate a new damages expert on an error of fact. As such, we must determine whether no reasonable person would have taken the view adopted by the district court. Although we do not necessarily agree with

37

the district court's decision and question the wisdom it, we find it to fall within the realm of reasonableness. Thus, we conclude that that the district court acted within its broad discretion in allowing LendingTools to substitute a new damages expert for the one that was stricken.

*Failure to Specifically Identify Trade Secrets*

The next issue presented in cross-appeal filed by The Bankers' Bank is whether the district court abused its discretion in denying a motion to dismiss filed on the first day of trial and a motion for judgment as a matter of law made during trial based on The Bankers' Bank's allegation that LendingTools failed to identify the specific trade secrets that it claimed were misappropriated. In response, LendingTools argues that the district court did not err in denying the motion to dismiss. LendingTools argues that the evidence presented at trial was sufficient to require submission of the issue of misappropriation of trade secrets to the jury.

The Bankers' Bank filed its motion to dismiss under K.S.A. 60-237(b) (discovery sanction) and K.S.A. 60-241(b) (lack of prosecution) for failure to comply with court orders requiring LendingTools to identify its trade secret claims. A district court's decision to dismiss a case for either of these reasons is reviewed for abuse of discretion. *Canaan v. Bartee*, 272 Kan. 720, 726, 35 P.3d 841 (2001). Moreover, The Bankers' Bank moved for judgment as a matter of law under K.S.A. 60-250. We review a district court's decision on a motion for judgment as a matter of law under the former directed verdict standard of review. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 706, 317 P.3d 70 (2014). So we must resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling was sought. When reasonable minds could reach different conclusions based on the evidence, the motion must be denied. 298 Kan. at 706-07.

38

A plaintiff seeking relief for misappropriation of trade secrets under the Uniform Trade Secrets Act "must identify the trade secrets and carry the burden of showing that they exist." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). A sufficient disclosure of the trade secrets is necessary to "allow [a defendant] a fair opportunity to prepare and present their best case or defense at a trial on the merits." *Phoenix Technologies, Ltd. v. DeviceVM, Inc.*, No. 09-4697-EDL, 2010 WL 8590525, at *2 (N.D. Cal. 2010) (unpublished opinion). In fact, courts from other jurisdictions have required that trade secrets be disclosed with reasonable particularity prior to discovery. See, e.g., *Vention Med. Advanced Components, Inc. v. Pappas*, No. 2016-0696, 2018 WL 2905593, at *6 (N.H. June 8, 2018); *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676, 681 (N.D. Ga. 2007).

Prior to trial, a district court should require a plaintiff to "'describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" (Emphasis added.) *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (quoting *Universal Analytics v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 [C.D. Cal. 1989] [finding that adequate disclosures distinguish trade secrets "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade," *aff'd* 914 F.2d 1256 [9th Cir. 1990]).

> "To meet this requirement, the plaintiff must make two showings: '[f]irst, the plaintiff must clearly identify what the "thing" is that is alleged to be a trade secret, and second, the plaintiff must be able to clearly articulate why that "thing" belongs in the legal category of [a] trade secret.' [*Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011)]. Upon an adequate disclosure, 'the defendant may then use that level of detail to determine the limits of the trade secret by investigating whether the information disclosed is within the public domain . . . or to develop . . . defenses.' *Loop AI Labs, Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1115 (N.D. Cal. 2016) (citing *Brescia v. Angelin*, 172 Cal. App. 4th 133, 147, 90 Cal. Rptr. 3d 842 [2009])." *E.*

39

*& J. Gallo Winery v. Instituut Voor Landbouw—En Visserijonderzoele*, No. 1: 17-CV-00808-DAD-EPG, 2018 WL 3062160, at \*4 (E.D. Cal. 2018).

We also note that the use of generic descriptions—such as "including"—have been held to be "so vague and unspecific as to constitute no disclosure at all since Defendants cannot 'ascertain at least the boundaries' of the alleged trade secrets." *Loop AI Labs, Inc., v. Gatti*, 195 F. Supp. 3d 1107, 1116 (N.D. Cal. 2016) (quoting *Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 984 [S.D. Cal. 1999]). This type of generic description is insufficient "because it does not clearly refer to tangible trade secret material." *Imax Corp.*, 152 F.3d at 1167. A plaintiff's "inability to describe the alleged trade secret with reasonable particularity puts the action in jeopardy" and may even result in the entry of summary judgment. *Brescia v. Angelin*, 172 Cal. App. 4th 133, 149, 90 Cal. Rptr. 3d 842 (2009). However, once a plaintiff has presented sufficient evidence to survive a dispositive motion, the existence of a trade secret becomes a question fact for the jury. *Progressive Products*, 292 Kan. 947, Syl ¶ 5.

We find the amount of detail that must be disclosed by a plaintiff seeking relief for misappropriation of trade secrets under the Kansas Uniform Trade Secrets Act—as well as that required to carry the burden of proving the existence of a trade secret—must be determined on a case-by-case basis. Prior to or during the course of discovery, the district court may require less specificity than would be required to survive a dispositive motion. However, by the time the case reaches the final pretrial conference, a plaintiff should be required by the district court to "concisely" identify the trade secrets alleged to have been misappropriated and the factual contentions that are allegedly sufficient to meet the elements set forth in K.S.A. 60-3320(4). See Kansas Supreme Court Rule 140 (c) (1) (2018 Kan. S. Ct. R. 203) (each party must concisely state its factual contentions as well as its claims and defenses at the final pretrial conference); K.S.A. 2017 Supp. 60-216(d) and (e).

40

Unfortunately, the present case appears to have gotten "off track" during the pretrial process. The importance of case management, pretrial discovery, and pretrial conferences was emphasized by former Associate Justice of the United States Supreme Court William J. Brennan Jr. in an address to the American College of Trial Lawyers in April 1958. Justice Brennan stated that "[p]retrial discovery and pretrial conference procedures can truly be employed as a scalpel to lay bare the true factual controversy," but he pointed out that they "will not work unless [the trial judge] makes it so by his leadership." See *Becton Dickinson and Co. v. Tyco Healthcare Group LP*, No. Civ.A. 02-1694 GMS, 2006 WL 890995, at *10 (D. Del. 2006) (unpublished opinion) (quoting Justice Brennan, *Changes in Trial Tactics*, Address before the American College of Trial Lawyers [April 1958]). Although Judge Walters entered an agreed pretrial order in this case, it was not fashioned with a scalpel.

The confusion over exactly what LendingTools contends to be the trade secrets that The Bankers' Bank misappropriated continued at trial. Because the verdict form did not ask the jury to determine the existence of any trade secrets—but instead jumped directly to the question of whether the jury found that The Bankers' Bank "misappropriated LendingTools' trade secret information"—it is unclear if it found any or all of the information to be a "trade secret" as defined by K.S.A. 60-3320(4). On the one hand, it is possible that the jury did not find any of the information to constitute a "trade secret." On the other hand, it is possible that the jury found some or all of the information to constitute a "trade secret" but did not find a "misappropriation" under K.S.A. 60-3320(2).

Nevertheless, based on the applicable standards of review, we do not find that the district court erred in denying the motion to dismiss or the motion for judgment as a matter of law presented at trial. We do not find that the district court acted unreasonably in denying the motion to dismiss on the first day of trial. Moreover, when the record on appeal is reviewed in the light most favorable to LendingTools, we find that reasonable

41

minds could reach different conclusions based on the evidence. Thus, we will not replace our judgment for that of the district court regarding these motions.

*Claim for Lost Profits*

The final issue presented by The Bankers' Bank in its cross-appeal is whether the district court erred in denying its motion for judgment as a matter of law on LendingTools' claim for lost profit damages. The Bankers' Bank contends that LendingTools' claim for lost profits is premised on the allegation that the BBOK, UBB, and FNBB would have renewed their contracts with LendingTools but for the alleged misappropriation of trade secrets. According to The Bankers' Bank, representatives of these customers testified that they would have left at the expiration of their contracts with LendingTools "no matter what" and Lending Tools presented no evidence at trial to the contrary. In response, LendingTools contends that The Bankers' Bank relies upon "testimony from compromised and biased witnesses" in support of its position regarding the lost profits claim.

As indicated above, we review a district court's decision on a motion for judgment as a matter of law under the former directed verdict standard of review. *Bussman*, 298 Kan. at 706. This means we must resolve all facts and inferences that may reasonably be drawn from the evidence in the light most favorable of the party against whom the ruling was sought and where reasonable minds could differ based on the evidence, the motion must be denied. 298 Kan. at 706-07. Applying this standard of review, we conclude that although The Bankers' Bank may have a strong argument to present to the jury regarding whether LendingTools is entitled to recover lost profits, the district court did not err in denying the motion for judgment as a matter of law and allowing evidence relating to the lost profit damages be presented at trial.

CONCLUSIONS

In conclusion, while recognizing that the law does not guaranty a perfect trial, we find that a new trial is appropriate under the unique circumstances presented in this case. We find that the prejudicial acts of counsel for the BBOK during opening remarks to the jury tainted the entire trial and denied LendingTools a fair trial. Although this conclusion in and of itself is sufficient to cause us to reverse the verdict and remand for a new trial, we also find that Instruction No. 19 was not legally appropriate. Moreover, we conclude the district court should reexamine the compilation trade secret issue on remand using the appropriate procedure. We also conclude that while the Kansas Uniform Trade Secrets Act provides the exclusive remedy for civil claims based on the misappropriation of a statutorily defined trade secret, it does not preempt tort claims based on misappropriation of information that falls outside of the statutory definition of a trade secret.

We also conclude that the district court did not abuse its discretion in failing to enter default judgment as a sanction against The Bankers' Bank. Furthermore, we conclude that that the district court acted within its discretion in allowing LendingTools to substitute a new damages expert for the one that was stricken prior to trial. We find the district court did not err in denying the motion for judgment as a matter of law and allowing evidence relating to the lost profit damages be presented at trial. Finally, we do not find that the district court erred in denying the motion to dismiss or the motion for judgment as a matter of law presented at trial.

Affirmed in part, reversed in part, and remanded for a new trial.